**Craig GLATTLY, Appellant,**

v.

**CMS VIRON CORPORATION f/k/a Viron Energy Services, Appellee.**

No. 01–04–00998–CV.

Court of Appeals of Texas, Houston (1st Dist.).

May 5, 2005.

Ronald D. Cohen, Houston, for appellant.

Joe W. Redden, Jr., Russell S. Post, Felicia Harris Kyle, Beck, Redden & Secrest, L.L.P., Lucas Thomas Elliot, Fulbright & Jaworski LLP., Houston, for appellees.

Michael J. Yanochik, Houston, for other interested party State Street Bank and Trust Company.

Panel consists of Justices TAFT, KEYES, and HANKS.

## OPINION

TIM TAFT, Justice.

Appellant, Craig Glattly, appeals from the denial of his special appearance. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(7) (Vernon Supp.2004–2005). We affirm.

### Background

Glattly, who is not a Texas resident, wore several corporate hats. First, he was the president and CEO of Academic Capital, L.L.C. Second, Glattly was a principal shareholder, the president, and the CEO of Academic Capital Group, Inc. ("ACG"), which was incorporated in 1999 to succeed to the business of Academic Capital, L.L.C. Third, Glattly was a principal shareholder, the president, and the CEO of Academic Capital Services, Inc. ("ACS").[1] In this opinion, we refer to ACG and ACS together as "the Academic entities." None of the Academic entities was a Texas corporation.

ACG's business was to underwrite and to finance certain leases, which ACG accomplished with capital provided under lines of credit with third-party lenders. ACS completed the lease transactions and administered the agreements' lease payments.

Appellee, CMS Viron Corporation ("Viron"), was a Missouri corporation that was

---

1. ACS was formerly known as Academic Service Corporation.

awarded a contract by Texas Southern University ("TSU") to construct an energy-savings project on TSU's Houston campus ("the TSU project"). To consummate this agreement, Viron and TSU entered into a "Master State and Municipal Lease/Purchase Agreement" ("the Master Lease") in 1998. Viron was the lessor under the Master Lease, and TSU was the lessee. Under the Master Lease, Viron was to lease the TSU project's equipment to TSU, and TSU was to make rental payments to Viron. To finance the TSU project, Viron assigned its rights under the Master Lease to ACG's predecessor ("the Lease Assignment"). To service the amount financed, Viron, ACS, and TSU entered into an escrow agreement ("the Escrow Agreement"), under which ACS was the escrow agent for the TSU project. In transactions such as that between Viron and TSU, ACG and its predecessor functioned as interim lenders, assigning their rights to the stream of rental payments under such leases to permanent lenders interested in receiving the income stream. Accordingly, ACG's predecessor assigned its rights under the Master Lease to State Street Bank and Trust of Boston ("State Street Bank").

The Master Lease between Viron and TSU provided that it was to be construed in accordance with the laws of Texas. The Lease Assignment between Viron and ACG's predecessor provided, in part, that

> If [Viron] has performance responsibilities under the Master Lease, and [TSU] abates payment of rent due to [Viron]'s lack of performance (as determined by [TSU]), then, upon notice to [Viron] from [ACG's predecessor], [Viron] will remit such abated amount within 10 days of [ACG predecessor's] notice.

The Escrow Agreement signed by Viron, TSU, and ACS provided, in part, as follows:

1. This Escrow Agreement relates to and is hereby made part of the [Master Lease] dated August 22, 1998 between [Viron] and [TSU], . . . .

. . .

3. [Viron, TSU, and ACS] agree that [ACS] will act as sole escrow agent under the [Master] Lease and this Escrow Agreement. . . . [ACS] shall not be deemed to be a party to the [Master] Lease, and this Escrow Agreement shall be deemed to constitute the entire agreement between [Viron, TSU, and ACS].

. . .

7. Moneys in the [escrow fund] shall be used for the cost of acquisition of the Equipment and related delivery, engineering and installation costs. Payment shall be made from the [escrow fund] for the cost of acquisition of part or all Equipment upon presentation to [ACS] of one or more properly executed Payment Request Forms executed by [TSU]. . . .

*[TSU] agrees that, should the final acceptance of the Equipment not occur prior to December 30, 1999, the unspent funds in the [Escrow account] shall become the property of [TSU], and that the [Master] Lease and Lease Payments will commence as if Acceptance had occurred on December 30, 1999, pursuant to sections 2 and 4 of the [Master] Lease.*

. . .

12. This Escrow Agreement shall be governed by and construed in accordance with the laws of the State of Illinois. . . . .

(Emphasis added.)

ACS made three of four payments from the escrow account to Viron for the TSU project. However, in December 1999, before the fourth payment was requested or

made, ACS learned, from communications between TSU and Glattly, that TSU was alleging problems with Viron's performance on the TSU project. TSU soon stopped making rental payments under the Master Lease. After TSU stopped making rental payments, Glattly directed that the funds in the escrow account be paid to State Street Bank, rather than to Viron.[2] Suffice it to say that the parties disputed below and dispute on appeal both Glattly's motivation for ordering payment to State Street Bank and the legal significance of that decision.[3] In a nutshell, the underlying litigation arose out of both the failed TSU project and the payment of the escrow funds to State Street Bank, rather than to Viron.

In October 2002, State Street Bank sued Viron for breach of contract, negligence, and breach of warranty relating to Viron's alleged faulty performance under the Master Lease and related matters. In December 2002, Viron counterclaimed against State Street Bank for breach of contract, conversion, and breach of fiduciary duty; asserted third-party claims against TSU for breach of contract and quantum meruit; and asserted third-party claims against the Academic entities for breach of contract, conversion, and breach of fiduciary duty relating to the payment of escrow funds to State Street Bank, rather than to Viron. Viron also sought indemnification from TSU if State Street Bank prevailed in its claims against Viron. In December 2003, the Academic entities asserted third-party claims against State Street Bank, seeking indemnification if Viron prevailed on its claims against the Academic entities.

By February 2004, Viron had amended its petition to assert claims against Glattly, Dennis Stephans,[4] and Eric Harkness[5] in their individual capacities (collectively, "the individual defendants") for breach of fiduciary duties, conversion, negligence (including gross negligence), fraud, breach of contract, tortious interference with con-

2. ACS paid the remaining escrow funds to State Street Bank in four payments, the last payments of which appear to have been authorized by another officer of the Academic entities. That officer is no longer a party to this lawsuit.

3. For example, in contesting Glattly's special appearance, Viron produced evidence that, in December 1999, it sent ACS a form request for the fourth and final payment, which form was also signed by TSU's Associate Vice President of Facilities, and which indicated that "the amount of this requisition constitutes a partial acceptance of the project." Viron also produced a certificate of final delivery and acceptance for the TSU project, which Glattly acknowledged was presented to ACS, signed by the same TSU official and dated December 22, 1999, indicating that Viron's equipment and work was satisfactory to and accepted by TSU. Viron also relied below on a portion of Glattly's deposition in which he stated that he did not tell a Viron officer before the payment to State Street Bank that ACS was paying the escrowed funds to State Street Bank. It is also evident from Viron's counsel's deposition questions that one of Viron's theories in the underlying lawsuit was that Glattly and ACS sought to please State Street Bank—an "excellent" customer of ACS's with whom it had done business repeatedly and with which ACS "wanted to maintain a good client relationship"—by paying the escrow money to it, rather than to Viron. On the other hand, other evidence indicated that (1) Glattly knew that TSU's alleged problem with Viron's performance continued after Viron's final payment request and after TSU signed the certificate of final delivery and acceptance; (2) Glattly was simply following the Escrow Agreement's terms when he paid the escrow funds to State Street Bank; and (3) Glattly informed Viron's officer, without objection, that he would pay the escrow funds to State Street Bank.

4. Dennis Stephans was, at various times, a shareholder and an officer of ACG.

5. Eric Harkness eventually became the sole shareholder in ACG and was a principal shareholder in ACS.

tractual relationships, and misapplication of fiduciary property, all apparently relating to the payment of the escrow funds to State Street Bank.[6] Among other things, Viron alleged that the individual defendants were personally liable to it because they (1) had "knowingly authorized, directed, participated in and ratified" the Academic entities' breach of fiduciary duties, breach of contract, and conversion; (2) had been "negligent in the performance of their duties as officers and directors of [the Academic entities], and in the supervision and management of the Acquisition Fund"; and (3) had tortiously interfered with the Academic entities' and Viron's contractual relationship "by causing the escrowed funds to be transferred to State Street Bank."[7] Separately and alternatively, Viron also alleged that the individual defendants were liable on all causes of action asserted against the Academic entities by virtue of those entities' being the individual defendants' alter egos. Each individual defendant specially appeared to contest personal jurisdiction over him.

The trial court granted the special appearances of Harkness and Stephans, but denied the special appearance of Glattly. Glattly appeals.[8]

### Standard of Review

■ Although a legal conclusion concerning the existence of personal jurisdiction is a question of law subject to *de novo* review, that conclusion must sometimes be preceded by the resolution of underlying factual disputes. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794

(Tex.2002); *Am. Type Culture Collection v. Coleman*, 83 S.W.3d 801, 805–06 (Tex. 2002). When, as here, the trial court does not issue fact findings, we presume that the trial court resolved all factual disputes in favor of its ruling. *Am. Type Culture Collection*, 83 S.W.3d at 805–06. When the appellate record contains the applicable trial record, these implied factual findings are not conclusive, and an appellant may challenge them for evidentiary sufficiency. *BMC Software Belgium*, 83 S.W.3d at 794; *Preussag Aktiengesellschaft v. Coleman*, 16 S.W.3d 110, 113 (Tex. App.-Houston [1st Dist.] 2000, pet. dism'd w.o.j.); *Wright v. Sage Eng'g, Inc.*, 137 S.W.3d 238, 248 (Tex.App.-Houston [1st Dist.] 2004, pet. denied). However, we apply a *de novo* review to the extent that the underlying facts are undisputed. *Preussag Aktiengesellschaft*, 16 S.W.3d at 113.

### Personal Jurisdiction

In two issues, Glattly argues that the trial court erred in denying his special appearance because the court had no specific personal jurisdiction over him, it had no general personal jurisdiction over him, and it could not assert personal jurisdiction over him based on the corporate defendants' being his alter egos.

### A. The Law

■ The plaintiff bears the initial burden of pleading allegations sufficient to bring a non-resident defendant within the

---

6. By this time, Viron had dropped TSU as a third-party defendant.

7. Viron did not differentiate the individual defendants' actions allegedly constituting fraud and misapplication of fiduciary property from the actions of the other third-party defendants.

8. Although Viron appealed the granting of Harkness's and Stephans's special appearances, it later moved to dismiss its appeal. We previously granted Viron's motion to dismiss its appeal, and our judgment now incorporates that dismissal.

terms of the Texas long-arm statute.[9] *Am. Type Culture Collection,* 83 S.W.3d at 807. When a non-resident defendant files a special appearance, however, the defendant assumes the burden of negating all bases of personal jurisdiction that the plaintiff has alleged. *Id.*

The long-arm statute provides that, "[i]n addition to other acts that may constitute doing business, a nonresident does business in this state if the nonresident: ... (2) commits a tort in whole or in part in this state...." TEX. CIV. PRAC. & REM.CODE ANN. § 17.042(2) (Vernon 1997). "On reaching a decision to exercise or [to] decline jurisdiction based on the defendant's alleged commission of a tort, the trial court should rely only on the necessary jurisdictional facts and should not reach the merits of the case." *Wright,* 137 S.W.3d at 251 n. 10; *accord Stauffacher v. Lone Star Mud, Inc.,* 54 S.W.3d 810, 819 (Tex.App.-Texarkana 2001, no pet.); *Royal Mort. Corp. v. Montague,* 41 S.W.3d 721, 732 (Tex.App.-Fort Worth 2001, no pet.); *Portland Savs. & Loan Ass'n v. Bernstein,* 716 S.W.2d 532, 535 (Tex.App.-Corpus Christi 1985, writ ref'd n.r.e.) (tort allegations), *overruled on other grounds, Dawson–Austin v. Austin,* 968 S.W.2d 319, 323 (Tex.1998). "[U]ltimate liability in tort is not a jurisdictional fact, and the merits of the cause are not at issue." *Wright,* 137 S.W.3d at 251 n. 10. "Rather, the purpose of a special appearance is to determine whether the actions alleged by a plaintiff suggest that a defendant should expect to be subject to jurisdiction in Texas." *Id.* "Accordingly, ... the necessary proof is only that the purposeful act was committed in this State." *Id.*

A court may assert personal jurisdiction over a non-resident defendant only if "the Texas long-arm statute authorizes jurisdiction and the exercise of jurisdiction is consistent with federal and state due process standards." *Am. Type Culture Collection,* 83 S.W.3d at 806. Because the Texas long-arm statute reaches as far as the federal constitutional requirements of due process will allow, the statute is satisfied if the exercise of personal jurisdiction comports with federal due process. *Id.*

Federal due process requirements are two-fold. First, the non-resident defendant must have purposefully established such minimum contacts with the forum state that the defendant could reasonably anticipate being sued there. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475–76, 105 S.Ct. 2174, 2183–84, 85 L.Ed.2d 528 (1985). If the non-resident defendant has purposefully availed itself of the privileges and benefits of conducting business in a state, the defendant has sufficient contacts to confer personal jurisdiction. *Id.* Random, fortuitous, or attenuated contacts do not suffice. *Id.* It is the quality and nature of the contacts, rather than their number, that is important. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 230 n. 11 (Tex.1991). "The purpose of the minimum-contacts analysis is to protect the defendant from being haled into court when its relationship with Texas is too attenuated to support jurisdiction. Accordingly, we focus upon the defendant's activities and expectations in deciding whether it is proper to call it before a Texas court." *Am. Type Culture Collection,* 83 S.W.3d at 806 (citations omitted). "Although not determinative, foreseeability is an important consideration in deciding whether the nonresident defendant has purposefully established minimum contacts

9. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (Vernon 1997).

with the forum state." *Wright*, 137 S.W.3d at 247.

■■■■ Minimum-contacts analysis is further divided into general and specific personal jurisdiction. *CSR, Ltd. v. Link*, 925 S.W.2d 591, 595 (Tex.1996). Specific personal jurisdiction exists if the defendant's alleged liability arises from or is related to an activity conducted within the forum. *Id.* The defendant's contacts must thus have had a substantial connection to the forum that resulted in the alleged injuries. *Shell Compania Argentina de Petroleo, S.A. v. Reef Exploration, Inc.*, 84 S.W.3d 830, 837 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). However, the "substantial connection" and "related to" requirements of specific personal jurisdiction do not mean that the non-resident defendant's purposeful contacts had to have been a proximate cause of the plaintiff's alleged injury. *See id.* at 837 n. 5 ("[Defendant] contends that specific jurisdiction should be determined under the 'substantial relevance test,' which requires that the non-resident defendant's purposeful contacts be at least a proximate cause of the plaintiff's injury. We decline to follow this test inasmuch as this test has not been adopted by any court in our jurisdiction."). In considering specific personal jurisdiction, we focus our minimum-contacts analysis on the defendant's, the forum's, and the litigation's relationship with each other. *Wright*, 137 S.W.3d at 248. "It is not necessary that a nonresident defendant's conduct actually occur in Texas, as long as the defendant's acts were purposefully directed toward the state." *Id.*

■■■ General personal jurisdiction allows a forum to exercise jurisdiction over a defendant even if the cause of action did not arise from or relate to the defendant's contacts with the forum. *Am. Type Culture Collection*, 83 S.W.3d at 806–07. To result in general personal jurisdiction over a defendant, the defendant's contacts with the forum must be continuous and systematic, which is a more demanding minimum-contacts analysis than that for specific jurisdiction. *Id.* at 807.

Second, if the nonresident defendant has purposefully established minimum contacts with the forum, the exercise of personal jurisdiction must also comport with fair play and substantial justice. *Burger King Corp.*, 471 U.S. at 475–76, 105 S.Ct. at 2183–84; *Guardian Royal*, 815 S.W.2d at 228.

**B. Specific Personal Jurisdiction**

Under part of his first issue, Glattly argues that Texas courts have no specific personal jurisdiction over him.

We begin by noting that Glattly made his special appearance "to the entire proceeding," rather than asserting that specific claims were severable and making his special appearance only as to them. *See* TEX.R. CIV. P. 120a(1) ("A special appearance may be made as to an entire proceeding or as to any severable claim involved therein."); *Dawson–Austin*, 968 S.W.2d at 324. Neither did his personal-jurisdiction briefing below assert separate jurisdictional arguments for separate causes of action or argue that any cause of action against him was severable. Accordingly, if personal jurisdiction exists over Glattly with respect to *any* claim that Viron alleged, we will hold that the trial court properly denied his special appearance. *See Dechon v. Dechon*, 909 S.W.2d 950, 955 & n. 5 (Tex.App.-El Paso 1995, no writ) (in family-law case in which plaintiff had pleaded both modification and enforcement causes of action, and in which personal jurisdiction existed with respect to enforcement cause of action but did not exist initially with respect to modification cause of action, holding that, "in light of [defendant's]

generic special appearance which contested the trial court's jurisdiction as to 'the entire proceeding,' rather than contesting jurisdiction as to the modification [cause of action] only, we find that the trial court was correct in overruling [defendant's] special appearance.").

 Among other claims, Viron alleged that Glattly had personally committed various intentional torts against it, such as breach of fiduciary duty, conversion, fraud, tortious interference with contractual relationships, and misapplication of fiduciary property. "It is well-settled that a corporate agent can be held individually liable for fraudulent statements or knowing misrepresentations even when they are made in the capacity of a corporate representative." *Wright*, 137 S.W.3d at 250; *accord Barclay v. Johnson*, 686 S.W.2d 334, 336–37 (Tex.App.-Houston [1st Dist.] 1985, no writ) ("[A] corporate agent knowingly participating in a tortious or fraudulent act may be held individually liable, even though he performed the act as an agent for the corporation."). "It is not necessary that the 'corporate veil' be pierced in order to impose liability, as long as it is shown that the corporate officer knowingly participated in the wrongdoing."[10] *Barclay*, 686 S.W.2d at 337.

In response to Glattly's special appearance, Viron produced evidence showing that the escrow account, funds, and contractual arrangement and any duties flowing from them were clearly tied to the TSU project, which took place in Texas. Even though Glattly did not sign any agreement arising out of the TSU project personally, the torts that he was alleged to have committed—all of which were based on his decision to disperse the escrow funds to State Street Bank—necessarily affected the TSU project because they affected the funds earmarked for payment to the project's parties. The disputed escrow funds amounted to over $2 million and constituted the final payment under the Master Lease, the contract executed to carry out the TSU project. Additionally, Viron produced as evidence Glattly's deposition testimony, in which he admitted to having called or talked to Gina Bolt, TSU's general counsel, "multiple times" about the problems that had arisen in December 1999 on the TSU project and indicated that he may have spoken with "anyone at [TSU] who could shed light on" the situation. The evidence also showed that Glattly received four faxes from Bolt about matters related to the TSU project dispute. We recognize that Viron did not allege any tort arising directly out of Glattly's communications with TSU, but we regard these communications as showing that Glattly could have foreseen that the commission of the torts that Viron did

---

**10.** Glattly relies on *Vosko v. Chase Manhattan Bank, N.A.* for the proposition that he cannot be sued in Texas simply because of the Academic entities' activities. *See* 909 S.W.2d 95, 99 (Tex.App.-Houston [14th Dist.] 1995, writ denied) (holding that individual defendant was not subject to general personal jurisdiction based on actions of corporation with which he was associated unless corporation was alter ego of individual). That holding in *Vosko* is distinguishable because it concerned general personal jurisdiction, not specific personal jurisdiction based on alleged intentional torts or fraud. *See Wright v. Sage Eng'g, Inc.*, 137 S.W.3d 238, 250 (Tex.App.-Houston [1st Dist.] 2004, pet. denied) ("*Wright* invokes the fiduciary shield doctrine, which protects a corporate officer or employee from the trial court's exercise of general personal jurisdiction when all of the individual's contacts with Texas were on behalf of his employer. Texas courts applying the fiduciary shield doctrine have expressly limited its application to attempts to exercise *general* jurisdiction over a nonresident defendant. The fiduciary shield doctrine does not protect a corporate officer from specific personal jurisdiction as to intentional torts or fraudulent acts for which he may be held individually liable.") (emphasis in original; citations omitted).

allege would affect a project in Texas to which Viron was a party.

Given this context, we hold that Glattly's alleged tort liability sufficiently "related to" conduct purposefully directed toward Texas, and likewise that Glattly's alleged conduct had a sufficiently substantial connection to Texas, for the exercise of personal jurisdiction over Glattly to comport with due process. Put another way, it would have been foreseeable to a person committing the tortious acts alleged here that the injurious effect of those acts would extend into Texas. *See Wright,* 137 S.W.3d at 248 ("It is not necessary that a nonresident defendant's conduct actually occur in Texas, as long as the defendant's acts were purposefully directed toward the state.").

Glattly does not challenge the sufficiency of the evidence relating to the court's implied factual findings based on Viron's evidence. *See Preussag Aktiengesellschaft,* 16 S.W.3d at 113 (indicating that appellant may challenge sufficiency of evidence supporting implied factual findings related to special appearance). Instead, Glattly challenges the trial court's implicit legal conclusion that these unchallenged findings supported the exercise of specific personal jurisdiction over him. Specifically, Glattly notes that (1) he was not a party to the Escrow Agreement; (2) his alleged actions took place in Illinois and were undertaken pursuant to an agreement (the Escrow Agreement) to which Illinois law applied; (3) ACS sent the escrow funds to State Street Bank in Massachusetts; and (4) Glattly had a choice of sending the escrow funds either to Massachusetts (State Street Bank) or to Missouri (Viron). Glattly also argues that (1) he was "duty-bound as a representative of the corporate escrow agent to determine to whom the balance of funds should go"; (2) his contacts with TSU were thus "innocent"; (3)

had Viron disputed Glattly's decision to send State Street Bank the escrow funds, ACS could have considered interpleading the funds, rather than paying them to the bank; (4) Glattly's actions "were neither fraudulent nor an intentional tort" because he "negated that [he had committed] an intentional tort in the trial court" by "negat[ing] that he sought or received any personal benefit from his administration of the escrow"—and thus could not have anticipated being haled into Texas courts in his individual capacity.

We reject Glattly's first category of arguments because it focuses on only part of the overall situation. All of the contracts were interrelated: the Escrow Agreement existed to service and to fund the Master Lease; the Master Lease existed to allow the TSU project to move forward; the TSU project took place in Texas. Glattly's alleged tortious disposal of the very escrow funds that funded the TSU project thus substantially related to activities in Texas and could potentially have a significant effect in that forum. We reject Glattly's second category of arguments because it relates, in essence, to the merits of whether he actually committed the intentional torts that Viron alleged. Ultimate tort liability is not a jurisdictional fact; the merits of claims are not at issue during a special appearance; and the proof necessary to show personal jurisdiction is only that the purposeful act was committed in Texas. *Wright,* 137 S.W.3d at 251 n. 10. Accordingly, we reject Glattly's arguments that the ultimate merits of Viron's claims against him show that he could not have anticipated being haled into court in Texas.

We hold that Glattly did not carry his burden of negating every basis for specific personal jurisdiction. Given this holding and the fact that Viron alleged that Glattly had committed intentional torts and fraudulent acts, we further hold that the trial

court had specific personal jurisdiction over Glattly. Because we have held that specific personal jurisdiction existed with respect to some of Viron's claims, and because Glattly filed his special appearance to the entire proceeding, we also hold that the trial court did not err in denying his special appearance, and we need not consider whether specific personal jurisdiction existed with respect to the remainder of Viron's claims against Glattly. *See Dechon,* 909 S.W.2d at 955, 955 n. 5. Finally, because we hold that Texas courts have specific personal jurisdiction over Glattly, we need not reach Glattly's alternative challenges to general personal jurisdiction or to jurisdiction based on alter ego status. *See Wright,* 137 S.W.3d at 251 n. 11.

## C. Fair Play and Substantial Justice

■ Because we have determined that Glattly purposefully established minimum contacts with Texas, we must also determine whether the exercise of personal jurisdiction over him comports with fair play and substantial justice. *See Burger King Corp.,* 471 U.S. at 475–76, 105 S.Ct. at 2183–84; *Guardian Royal,* 815 S.W.2d at 228.

Glattly had the burden to present a "compelling case" that exercising personal jurisdiction over him would not comport with fair play and substantial justice. *See Guardian Royal,* 815 S.W.2d at 231. The fairness inquiry is judged by a "stringent standard" and is met only in "rare cases." *Id.* In considering the fairness of exercising personal jurisdiction over a non-resident defendant, we consider, when appropriate, such matters as the burden on the defendant, the interests of the forum state in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental, substantive social policies. *Id.*

Glattly asserts that exercising personal jurisdiction over him does not meet this test. Specifically, Glattly argues that (1) he would be burdened by having to defend himself in Texas because he did not engage in economic activity in Texas "either at the time of the alleged liability or at the time the lawsuit was filed, and he does not now"; (2) Texas has no compelling interest in providing a forum for the resolution of the dispute between Viron and Glattly because both are non-residents and because their contacts occurred exclusively out of state; and (3) allowing him to be sued in Texas just because the other parties to the lawsuit first sued or were sued here "would permit jurisdiction over a defendant to be determined by plaintiff or by a third-party, contrary to due process requirements." [11]

However, Glattly did not make these specific arguments in the trial court with respect to the fair-play-and-substantial-justice inquiry. Rather, he twice stated— in cursory and conclusory fashion—simply that the assertion of personal jurisdiction over him would offend traditional notions of fair play and substantial justice. The only elaboration that he provided below

---

11. Glattly also argues, with respect to the shared interest of the several states in furthering fundamental, substantive social policies, that "the substantive policy here should be the refusal to exercise jurisdiction ex post facto where there was no jurisdiction at the time of the injury; further, that continuing contact in the forum state which begins after a cause of action arose outside the forum state should be irrelevant to the jurisdictional inquiry." This argument relates to Glattly's challenge concerning the exercise of general personal jurisdiction over him. Because we do not decide whether Texas courts may exercise general personal jurisdiction over Glattly, we do not consider this argument.

was that "Texas has no special interest in asserting personal jurisdiction over [Glattly], who only ever had random and isolated contacts with Texas if at all." Accordingly, Glattly has waived his appellate fair-play-and-substantial-justice challenge. *See* TEX.R.APP. P. 33.1(a)(1). The waiver of this challenge is another basis for affirming the trial court's order. Additionally, we note that the trial would not have erred if it concluded, based on the fact that Glattly's alleged tortious acts affected the TSU project in Texas and that the underlying litigation was based in large part on the same factual nexus, both that (1) Texas has an interest in adjudicating a dispute that, at its core, relates to a contract for capital improvements to be performed in the state and (2) the fairness calculation weighs in favor of adjudicating all related disputes in one forum.

## Conclusion

We overrule appellant's first issue. We do not reach his second issue (concerning personal jurisdiction based on alter ego status). We affirm the order of the trial court.