**Chris UCHE, M.D., Appellant,**

v.

**Melody ALLISON, Individually and as Representative of the Estate of Dorothy Mueller, Appellee.**

**No. 01–06–00546–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Oct. 11, 2007.

Rehearing Overruled Dec. 14, 2007.

Nelson Dean Skyler, Philip Robert Brinson, Robin K. Taylor, Brown Sims, P.C., Houston, TX, for Appellant.

I. Nelson Heggen, Law Office of I. Nelson Heggen, Houston, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices KEYES and HIGLEY.

## OPINION

EVELYN V. KEYES, Justice.

In this medical malpractice suit, appellant, Chris Uche, M.D., brings an accelerated interlocutory appeal challenging the trial court's order denying his motion for special appearance. In one issue on appeal, Dr. Uche argues that the trial court erred in denying his special appearance in favor of appellee, Melody Allison, individually and as representative of the estate of Dorothy Mueller (collectively "Allison").

We reverse and render.

## BACKGROUND

The facts of this dispute can be found in a prior opinion from this Court.[1] Dorothy Mueller boarded a Carnival Cruise Ship that departed from Galveston on February 21, 2002. Because Mrs. Mueller has a feeding tube, her son-in-law and her daughter, Melody, went along with her.[2] During the voyage, Mrs. Mueller's feeding tube became dislodged. According to Allison's third amended petition, Mrs. Mueller attempted to get care from the ship's infirmary, where one doctor, Dr. Uche, and three nurses were stationed. It is undisputed that Mrs. Mueller did not get her feeding tube reinserted on the cruise ship. A couple of weeks after the cruise, Mrs. Mueller had a stroke that is alleged to have been the result of the negligent care given aboard the ship. Allison filed suit against various parties, including Dr. Uche, the head nurse, and Carnival Cruise Lines. In our prior opinion, we held that while Dr. Uche worked aboard the ship, the *Celebration,* he served as an independent contractor and that Mrs. Mueller's injury occurred in international waters.[3]

Dr. Uche filed a special appearance arguing that the trial court lacked both general and specific jurisdiction over him. The trial court denied Dr. Uche's motion for special appearance on May 15, 2006.

On December 27, 2006, while this appeal was pending, Dr. Uche moved for sanctions, alleging that Allison made "gross misstatements of fact and concocted arguments [that] lack even a scintilla of merit or credibility independently, or collectively, in addition to Appellees' brief containing such an inordinate amount of falsehoods,

---

**1.** In our prior opinion, we conditionally granted mandamus relief because the trial court abused its discretion in imposing death penalty sanctions against Carnival Cruise Lines. *See In re Carnival,* 193 S.W.3d 229, 237 (Tex.App.-Houston [1st Dist.] 2006, orig. proceeding).

**2.** Mrs. Mueller suffered a stroke in early 2000 that required her to wear the feeding tube. *See In re Carnival,* 193 S.W.3d at 232.

**3.** *See In re Carnival,* 193 S.W.3d at 234.

inventions and deceptions...." On January 30, 2007, we ordered that the motion for sanctions be carried with the case. Dr. Uche moved to stay the trial proceedings, and, on December 8, 2006, we ordered that the commencement of trial be stayed pending resolution of this appeal. *See* TEX. CIV. PRAC. & REM.CODE ANN. 51.014(b) (Vernon Supp.2006).

## PERSONAL JURISDICTION

In his sole issue on appeal, Dr. Uche argues that the trial court erred when it denied his special appearance.

### Standard of Review

 Whether a court has personal jurisdiction over a defendant is a question of law subject to de novo review. *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 794 (Tex.2002); *Glattly v. CMS Viron Corp.,* 177 S.W.3d 438, 445 (Tex.App.-Houston [1st Dist.] 2005, no pet.). The trial court, however, must frequently resolve questions of fact before deciding the jurisdictional question. *BMC Software,* 83 S.W.3d at 794. If the trial court enters an order denying a special appearance and issues findings of fact and conclusions of law, we may review the findings of fact on legal and factual sufficiency grounds and review the conclusions of law de novo as a legal question. *Silbaugh v. Ramirez,* 126 S.W.3d 88, 94 (Tex. App.-Houston [1st Dist.] 2002, no pet.) (citing *BMC Software,* 83 S.W.3d at 794).

 If the trial court does not issue findings of fact and conclusions of law, as here, "all facts necessary to support the judgment and supported by the evidence are implied." *BMC Software,* 83 S.W.3d at 795. In other words, if the trial court does not issue findings of fact, a reviewing court should presume that the trial court resolved all factual disputes in favor of its judgment. *Tri–State Bldg. Specialties, Inc. v. NCI Bldg. Sys., L.P.,* 184 S.W.3d 242, 246 (Tex.App.-Houston [1st Dist.] 2005, no pet.) (citing *American Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 806 (Tex.2002)). These findings are not conclusive when the appellate record includes both the reporter's and clerk's records, and they may be challenged for legal and factual sufficiency on appeal. *Id.* To the extent that the underlying facts are undisputed, however, we conduct a de novo review. *Glattly,* 177 S.W.3d at 445.

 Two requirements must be met before a Texas court can exercise personal jurisdiction over a nonresident defendant. First, the Texas long-arm statute must authorize the exercise of jurisdiction, and second, the exercise of jurisdiction must be consistent with the guarantees of due process. *Coleman,* 83 S.W.3d at 806; *Tri–State,* 184 S.W.3d at 248.

 The long-arm statute permits Texas courts to exercise personal jurisdiction over a nonresident[4] defendant that "does business" in Texas. TEX. CIV. PRAC. & REM. CODE ANN. § 17.042 (Vernon 1997); *BMC Software,* 83 S.W.3d at 795. The statute lists three activities that constitute "doing business": (1) contracting with a Texas resident when either party is to perform the contract in whole or in part in Texas; (2) committing a tort in whole or in part in Texas; and (3) recruiting Texas residents for employment inside or outside of Texas. TEX. CIV. PRAC. & REM.CODE ANN. § 17.042. This list, however, is not exclusive,[5] and the statute's "doing business" requirement

---

**4.** A "nonresident" includes "an individual who is not a resident of [Texas]" and "a foreign corporation, joint-stock company, association, or partnership." TEX. CIV. PRAC. & REM.CODE ANN. § 17.041 (Vernon 1997).

**5.** *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 795 (Tex.2002).

is limited only by the requirements of federal due process. *Koll Real Estate Group, Inc. v. Purseley,* 127 S.W.3d 142, 146 (Tex. App.-Houston [1st Dist.] 2003, no pet.) (citing *Schlobohm v. Schapiro,* 784 S.W.2d 355, 356 (Tex.1990)).

 Because the language of the long-arm statute is broad, its requirements are considered satisfied if the exercise of personal jurisdiction comports with federal due process limitations. *CSR, Ltd. v. Link,* 925 S.W.2d 591, 594 (Tex.1996). In practice, the two conditions are combined into one requirement of due process. *Wright v. Sage Eng'g, Inc.,* 137 S.W.3d 238, 247 (Tex.App.-Houston [1st Dist.] 2004, pet. denied). Thus, the true determinative inquiry is one of federal constitutional due process. *See id.; see also Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991).

 With respect to personal jurisdiction, federal due process requires two things. First, the nonresident defendant must have purposefully established such minimum contacts with the forum state that the defendant could reasonably anticipate being sued there. *Glattly,* 177 S.W.3d at 447 (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475–76, 105 S.Ct. 2174, 2183–84, 85 L.Ed.2d 528 (1985)). Second, if the nonresident defendant has purposefully established minimum contacts with the forum, the exercise of personal jurisdiction must also comport with traditional notions of fair play and substantial justice. *Id.* (citing *Burger King,* 471 U.S. at 475–76, 105 S.Ct. at 2183–84). As to fairness, the defendant bears the burden of presenting a "compelling case" that exercising jurisdiction over him would not be fair and just. *See id.* at 450. Only in rare cases, however, will a Texas court's exercise of personal jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state. *Guardian Royal Exch. Assurance,* 815 S.W.2d at 231.

 A nonresident establishes minimum contacts with Texas by purposefully availing itself of the privileges and benefits inherent in conducting business in the state. *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 784 (Tex. 2005); *Koll,* 127 S.W.3d at 146. The touchstone of jurisdictional due process is "purposeful availment," i.e., "it is essential in each case that there be some act by which the *defendant purposefully avails* itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Michiana,* 168 S.W.3d at 784 (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958)) (emphasis in *Michiana* ). Three aspects of the requirement are important in this case, as in *Michiana:* (1) only the defendant's contacts with the forum count, not the unilateral activity of another party or person; (2) the acts relied on to establish jurisdiction must be "purposeful" rather than fortuitous; and (3) the defendant must seek some benefit, advantage, or profit by "availing" itself, or himself, of the jurisdiction. *Id.* at 785. It is the quality and nature of the defendant's contacts, rather than their number, that is important to the minimum-contacts analysis. *Trigeant Holdings, Ltd. v. Jones,* 183 S.W.3d 717, 725 (Tex.App.-Houston [1st Dist.] 2005, pet. denied). Random, fortuitous, or attenuated acts, or the unilateral acts of a third party, are not sufficient to confer personal jurisdiction. *Id.* Although not determinative, foreseeability is an important consideration in deciding whether a nonresident defendant has purposefully established minimum contacts. *Glattly,* 177 S.W.3d at 446–47.

The minimum contacts element of due process is further divided into specific and general personal jurisdiction. *Id.* at 447. A court may exercise specific jurisdiction over a nonresident defendant if his alleged liability arises from, or is related to, an activity conducted within the forum. *Id.* (citing *CSR*, 925 S.W.2d at 595). The contacts must be purposefully directed at the forum and have a "substantial connection" that results in the alleged injuries. *Shell Compañia Argentina de Petroleo, S.A. v. Reef Exploration, Inc.*, 84 S.W.3d 830, 837 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). We focus our analysis on the relationship among the defendant, the forum, and the litigation. *Id.*

A court may exercise general jurisdiction over a nonresident defendant if the defendant's contacts with the forum state are continuous and systematic, even if the cause of action did not arise from or relate to the defendant's contacts with the forum. *Glattly*, 177 S.W.3d at 447. In confining one's activities to another forum, "a nonresident may purposefully avoid a particular jurisdiction by structuring its transactions so as neither to profit from the forum's laws nor be subject to its jurisdiction." *Michiana*, 168 S.W.3d at 785. For the court to have specific jurisdiction, the nonresident defendant must have established minimum contacts by purposefully availing itself of the privilege of conducting activities in Texas and there must be a substantial connection between those contacts and the operative facts of the litigation. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 576, 585 (Tex.2007).

The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant within the provisions of the Texas long-arm statute. *BMC Software*, 83 S.W.3d at 793. A nonresident defendant challenging the court's exercise of personal jurisdiction through a special appearance carries the burden of negating all grounds for personal jurisdiction alleged by the plaintiff. *Id.; Glattly*, 177 S.W.3d at 446.

**General Jurisdiction**

On appeal, Allison contends that Dr. Uche had continuous and systematic contacts with Texas because the ship on which he practiced took on 1,300 Texans every week for a four-month period. Under the section of the petition styled "Long Arm Statute," Allison alleges that Dr. Uche is

> amenable to jurisdiction in Texas because [he] has purposefully established minimum contacts with Texas. Specifically, [he] sought employment with Carnival Corporation so as to be stationed in Galveston, Texas for months at a time. For each week that Defendants worked out of the Galveston port, over 1,000 Texas residents and others coming to Texas boarded the ship. The individual Defendants purposefully put themselves in the position of providing medical care to any Texas resident who needed care during the cruise. When medical care personnel deliberately station themselves so as to be giving care to Texas residents for months at a time, Texas has a substantial interest in ensuring the quality of that care. Additionally, since Defendants contract to work for Carnival for half a year at a time out of Galveston, Texas or other United States ports, it would not be unduly burdensome or otherwise unfair to them to defend this suit in Galveston, Texas.

Allison argues that the trial court has general jurisdiction over Dr. Uche and that Dr. Uche had continuous and systematic contacts with Texas because of the number of passengers who came aboard the *Cele-*

*bration* and the number of passengers who visited the infirmary during the time that the *Celebration* was stationed in Galveston. Dr. Uche argues that he did not have continuous and systematic contacts with the state to subject him to general jurisdiction.

The head nurse on the *Celebration,* Constance Jackson, testified by deposition that she worked on the *Celebration* for four months. Jackson estimated that the *Celebration's* infirmary would see 20 passengers and 50 crew persons a week. She testified that there were a lot of Texans on board, but that people came from other states as well.[6] She said that the *Celebration* would leave port once a week on average and that approximately 1,300 passengers would board the *Celebration* every week. Out of the 2,000 person capacity of the *Celebration,* there were three passengers to every crew member. The ship would stay in port for eight hours to unload passengers and pick up new passengers, and it would then set out to sea.

In his deposition, Dr. Uche testified that he worked on the *Celebration* for a four-month period. He testified that Carnival assigns the doctors to the ships and that he was on the ship 99% of the time. He would fly into one of the Houston airports and then take a shuttle from the airport to the *Celebration.* He flew at least twice to the two Houston airports. He stated that if a nurse saw something she cannot handle, she was supposed to contact the doctor. Dr. Uche stated that while aboard the ship, he could not refuse medical help to a person, but that in certain circumstances he could refuse to see a patient. He clarified his answer to say that if someone came to see him, he would have to see them. If a passenger came to see him in the infirmary, he would never refuse to see them. The infirmary had a morning session and an afternoon session, and he was on call 24 hours a day. Dr. Uche stated that if a passenger boarded the ship with a headache, the passenger could come to the infirmary and get some aspirin. He clarified that most of the time while they were in port, the infirmary was closed. If someone became sick while at sea, the clinic would arrange for the patient to be transported to a facility on land once the ship docked.

Dr. Uche is not licensed to practice medicine in Texas, and he has never practiced medicine in Texas. He neither owns any property in Texas nor pays any taxes on any property in Texas. Dr. Uche testified that he conducts no business of any kind in Texas. He only handled patients while on board the *Celebration,* and he only saw patients after the ship had gone into international waters.

■ General jurisdiction requires a showing that the defendant conducted "substantial activities" within the forum, which requires a more demanding minimum contacts analysis than specific jurisdiction. *Coleman,* 83 S.W.3d at 807; *Guardian Royal Exch. Assurance,* 815 S.W.2d at 228. Thus, general jurisdiction presents a "more onerous" burden of proof. *Marchand,* 83 S.W.3d at 797. In essence, under general jurisdiction, the contacts "should be such as to justify categorizing the defendant as a resident of this State." *Schexnayder,* 187 S.W.3d at 243. "[O]ne suggested method of determining whether general jurisdiction over a defendant truly lies in Texas is by determining whether a citizen of another state, on a claim for wrongdoing in another state, could nevertheless properly sue the defendant in Texas courts." *Schexnayder,* 187

6. Other than Jackson's testimony, Allison presented no evidence of the number of Texans onboard the *Celebration,* but presumably it was substantial.

S.W.3d at 243 (citing Charles Rhodes, *The Predictability Principle in Personal Jurisdiction Doctrine: A Case Study on the Effects of a "Generally" too Broad, but "Specifically" too Narrow Approach to Minimum Contacts,* 57 BAYLOR L.REV. 135, 149–55 (2005)).

Dr. Uche contends that he does not have minimum contacts with Texas because any contact he had with Texas was not chosen by Dr. Uche, but rather by Carnival, and that the unilateral acts of a third party do not meet the requirements of a defendant who purposefully avails himself of the benefits and protections of Texas law. For instance, Dr. Uche argues that "Carnival's voluntary choice to have Galveston be a port of departure for its cruise line, is a unilateral act of its own, for which Uche is not responsible." Dr. Uche also argues that

the fact that Carnival happens to have customers (passengers), albeit Texas residents or residents of other states, is likewise a result of Carnival's (or arguably the customer/passenger's) unilateral acts.... Any monies paid to Uche by Carnival, on account of the Carnival/Uche contract, executed in Georgia, for work to be performed in international waters does not transform Uche into an entity that is purposefully availing itself of the privilege of doing business in Texas.

Allison argues that Dr. Uche had ample contacts with Texas to justify jurisdiction. Namely, the trial court has general and specific jurisdiction over Dr. Uche based on the fact that "Mrs. Mueller was one of approximately 1,300 Texans that boarded the Carnival Celebration every week before it left its home port of Galveston." Allison further argues that "the 1,300 Texans were the sole source of patients for the months he was based in Galveston" and that Dr. Uche "made himself available to over 20,000 Texans for medical care as he set up shop on the Carnival cruise ship across a 30′ gangplank from Galveston." Allison argues that "[t]he incident giving rise to this suit was a result of Uche's repeated weekly contacts with Texas made in pursuit of his medical practice."

Allison has pleaded that

[He] sought employment with Carnival Corporation so as to be stationed in Galveston, Texas for months at a time ... The individual defendants purposefully put themselves in the position of providing medical care to any Texas resident who needed care during the cruise. When medical care personnel deliberately station themselves so as to be giving care to Texas residents for months at a time, Texas has a substantial interest in ensuring the quality of that care.

We limit our analysis to Dr. Uche's contacts with the state, not Carnival's contacts with the state.[7] *See Moki Mac,* 221 S.W.3d at 575 (stating that, for purposeful availment, "only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person"). Here, while it may have been foreseeable that Dr. Uche would commit some act or fail to act and that his actions could lead to litigation in Texas, the record in this case does not reflect that Dr. Uche himself, purposefully directed any act toward Texas. *See CSR Ltd.,* 925 S.W.2d at 596 ("Absent ... a purposeful act, foreseeability alone cannot create minimum con-

---

7. In her response to Dr. Uche's motion for sanctions, Allison requests that this Court take judicial notice that Carnival had stationed the *Celebration* in the port of Galveston since 2000. Although this may be true, we are not concerned with the contacts that Carnival had with Galveston, Texas, but rather the contacts that Dr. Uche had. *See Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 575 (Tex. 2007).

tacts between [the defendant] and Texas.").

Allison's pleading that Dr. Uche purposefully "sought employment with Carnival Corporation so as to be stationed in Galveston, Texas for months at a time" is refuted by Dr. Uche's statement that *Carnival* assigns him to a specific ship. He stated that "Carnival assigns you, but sometimes you can request." He clarified, "[W]ell, that's where I was assigned. I mean, see, working for a company you can't really say, well, I want to go here. That's where I was assigned to go."

The record does not show that Dr. Uche asked Carnival that he be sent to Texas, that he intended to serve the Texas market, that he communicated with patients living in Texas, or that he had any substantial contact with Texas residents before the ship reached international waters. *See Moki Mac*, 221 S.W.3d at 577 ("Examples of additional conduct that may indicate whether a defendant purposefully availed itself of a particular forum include advertising and establishing channels of regular communication to customers in the forum state."); *see also CSR*, 925 S.W.2d at 595 (stating that there must be some indication that defendant intended to serve Texas market). Nor does the record show that the alleged tortious medical treatment or failure to give medical treatment occurred in Texas. *See Anderson v. Bechtle*, 2001 WL 930205, at *2 (Tex.App.-Houston [1st Dist.] Aug. 16, 2001, no pet) (not designated for publication) ("Standing alone, it is difficult to see how a failure to act could meet the purposeful availment requirement needed to establish personal jurisdiction."). Thus, we conclude that the record does not support Allison's claims that Dr.

Uche purposefully put himself in a position to treat Texas residents.[8]

 Moreover, although Dr. Uche traveled to the state, occasional travel to Texas is insufficient by itself to establish continuous and systematic contact. *Preussag Aktiengesellschaft v. Coleman*, 16 S.W.3d 110, 124 (Tex.App.-Houston [1st Dist.] 2000, pet. dism'd w.o.j.); *Minucci v. Sogevalor, S.A.*, 14 S.W.3d 790, 796 (Tex. App.-Houston [1st Dist.] 2000, no pet.). While it is true that the *Celebration* had its port in Galveston, Texas, and that Dr. Uche stayed on the ship during its time in port, port calls are not construed as substantial contacts of a quality sufficient to establish a court's general jurisdiction over a nonresident defendant. *See Asarco, Inc. v. Glenara, Ltd.*, 912 F.2d 784, 786–87 (5th Cir.1990) (finding no jurisdiction and discounting quality of contacts regarding 20 port calls of vessels to Louisiana because company that managed vessels did not choose where vessels would make port); *Nicolaisen v. Toei Shipping Co., Ltd.*, 722 F.Supp. 1162, 1165 (D.N.J.1989) (finding that 17 port calls to New Jersey over a three-to-four year period and shipowner's dealing with time charterer in New Jersey did not establish general jurisdiction); *Am. Overseas Marine Corp. v. Patterson*, 632 So.2d 1124, 1126–30 (Fla.App.1994) (finding no jurisdiction and discounting quality of contacts relating to port calls in Florida because they were not made on the orders of defendants but instead were made at the direction of the United States military under contracts with the United States). Thus, the fact that the *Celebration* operated out of Galveston does not support the exercise of general jurisdiction over Dr. Uche.

8. In her brief, Allison claims that it was Dr. Uche himself who stationed himself at that port. Allison cites no authority or citation to the record that Dr. Uche made the decision to work on a ship based in Galveston, and the record reveals the opposite—that Carnival made the decision to send Dr. Uche to Galveston.

Moreover, Carnival's decision to make Galveston a port of call diminishes the quality of Dr. Uche's contact—living on a ship that is docked in the port of Galveston—with the state. *See Farwah v. Prosperous Maritime Corp.*, 220 S.W.3d 585, 594 (Tex.App.-Beaumont 2007, no pet.) (concluding that because decision to make Texas a port of call was made by a third party, quality of defendant's contact diminished); *see also Am. Type Culture Collection*, 83 S.W.3d at 809 (discounting quality of contact regarding defendant's attendance at five conferences in Texas when defendant did not select conference locations); *Reyes v. Marine Drilling Cos.*, 944 S.W.2d 401, 402–04 (Tex.App.-Houston [14th Dist.] 1997, no writ) (discounting quality of contact when defendant sent representatives to Texas at least 204 times to perform quality-assurance inspections that were necessitated under contractual obligations between defendant and United States government). Thus, we also conclude that Dr. Uche's limited presence in the state is not enough to amount to substantial activities in the state for a court to exercise general jurisdiction.

Because Dr. Uche's contacts were not purposefully directed at Texas and because the contacts he did have with the state were not continuous and systematic, we conclude that the trial court lacks general jurisdiction over Dr. Uche.[9]

**Specific Jurisdiction**

We recognize that on one occasion the United States Supreme Court has found specific jurisdiction based on alleged wrongdoing intentionally directed at a resident of the forum. *See Calder v. Jones*, 465 U.S. 783, 788–789, 104 S.Ct. 1482, 1486–87, 79 L.Ed.2d 804 (1984). However, the Texas Supreme Court has held that the foreseeability of causing injury in another state is not a "sufficient benchmark" for the exercise of personal jurisdiction over a defendant. *Michiana*, 168 S.W.3d at 789. Rather, "it is 'the defendant's conduct and connection with the forum' that are critical.'" *Id.*

The operative fact of Allison's claim with respect to specific jurisdiction is Dr.

---

**9.** In Florida, the courts of appeals have held that its long-arm statute does not allow the court to exercise personal jurisdiction over doctors who serve aboard cruise ships unless the injury occurred inside Florida's territorial waters. *See Elmlund v. Mottershead*, 750 So.2d 736, 736 (Fla.Ct.App.2000); *Benson v. Norwegian Cruise Line Limited*, 859 So.2d 1213, 1215 (Fla.Ct.App.2003) (reversing order granting special appearance because injury occurred within Florida's jurisdictional waters).

But, in *Wurtenberger v. Cunard Line Ltd.*, a cruise ship's physician, who was not a resident of New York, and who was sued for medical malpractice for incidents that did not occur in New York, was nevertheless found to be subject to personal jurisdiction under New York's long-arm statute. 370 F.Supp. 342, 344–45 (S.D.N.Y.1974). The court found preliminarily that the physician had "transacted business" within the state because, although he was not licensed to practice medicine in New York and claimed to have been in New York on only four occasions, he was a member of the ship's crew when it departed New York and when it returned to New York, and presumably practiced medicine while the ship was in New York waters. *Id.* at 344. With respect to the "nexus" requirement of section 302(a)(1), the court determined that the physician was present on the ship when passengers boarded in New York, and effectively held himself out as a qualified doctor who would treat medical problems on the cruise. *Id.* at 345. Thus, some of the ship's passengers, many of whom were foreseeably New York residents, decided to forego other medical services while at sea in reliance on the physician's competence. *Id.* The court reasoned that "[t]he alleged subsequent malpractice in the course of the cruise, therefore, while it did not occur in New York, may be said to have arisen out of [the doctor's] 'transaction of business' in New York." *Id.*

Uche's alleged failure to give care aboard the *Celebration*. In her third amended petition, Allison states,

There was apparently no qualified physician on board and the nurses on board did not have the medical training necessary to reinsert and retape the feeding tube, and refused to do so. Instead, Carnival informed the Allisons and Mrs. Mueller [that] they had to fend for themselves. As a result of the actions and inactions of defendants, Mrs. Mueller suffered a stroke on March 16, 2002, which left her significantly impaired far beyond her pre-March condition so that her quality of life has been significantly diminished.

Allison alleges that Dr. Uche "provided medical care, advice and treatment to Dorothy Mueller by assessing her condition, determining her need for care, and then abandoning her." At the hearing on Dr. Uche's special appearance, however, counsel for Allison stated that a nurse came to Mrs. Mueller's cabin and escorted her to the infirmary but that, because Mrs. Mueller was in a wheelchair, it was difficult to get around in the infirmary. Medical personnel then came to Mrs. Mueller's cabin, but did not inform anyone that a medical doctor was on board. In short, although Allison alleges that Dr. Uche committed a tort in whole or in part in this State and thus satisfies the jurisdictional requirements of the Texas Long–Arm Statute and federal due process, there is no evidence that he was even made aware of her condition.

Allison has not produced any evidence of any connection between Dr. Uche's conduct and contacts with Texas and Mrs. Mueller's injuries, which are alleged to have happened while she was on the *Celebration* in international waters. *See Shell Compania Argentina de Petroleo*, 84 S.W.3d at 837 (holding that to satisfy minimum contacts element of due process, contacts must be purposefully directed at forum and have substantial connection that results in alleged injuries). Allison presented no evidence at the special appearance hearing that Dr. Uche was made aware of Dorothy's need for assistance, assessed her medical condition, determined her need for care, or abandoned her, as Allison alleges. Contrary to Allison's allegations, Dr. Uche's affidavit states that it was never made known to him, nor was he in any way aware, that Dorothy needed medical assistance. He also states that he never had a physician-patient relationship with Dorothy. Allison did not rebut this evidence. Therefore, we cannot say that Dr. Uche's alleged failure to act on the high seas to treat a passenger from Texas, Dorothy, bears a substantial connection with Dr. Uche's contacts with Texas sufficient to subject him to the specific jurisdiction of the courts of this state. Stated another way, Dr. Uche's travel within the state and his temporary residence on board the *Celebration* for the purpose of rendering medical services are not sufficiently related to the acts of medical negligence alleged to have taken place in international waters to satisfy the requirements of federal due process in subjecting him to personal jurisdiction in this state.

We hold that Dr. Uche has negated all grounds for personal jurisdiction asserted by Allison. We conclude that the trial court lacks general jurisdiction over Dr. Uche because he did not have continuous and systematic contacts with Texas. We also conclude that specific jurisdiction is lacking because his alleged liability to Allison does not arise from or relate to his contacts with Texas.

### Conclusion

We reverse the order of the trial court and render judgment dismissing Dr. Uche

from the litigation. We deny Dr. Uche's motion for sanctions. We withdraw our December 8, 2006 order that stayed the commencement of trial.