

# NUMBER 13-12-00536-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

TV AZTECA, S.A.B. DE C.V.,
PATRICIA CHAPOY, AND
PUBLIXMAN, S.A. DE C.V.,                              Appellants,

v.

GLORIA DE LOS ANGELES
TREVINO RUIZ, INDIVIDUALLY
AND ON BEHALF OF HER MINOR
CHILD, ANGEL GABRIEL DE JESUS
TREVINO, AND ARMANDO ISMAEL
GOMEZ MARTINEZ,                                      Appellees.

On appeal from the 139th District Court
of Hidalgo County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Benavides and Longoria
Memorandum Opinion by Chief Justice Valdez**

Appellants, TV Azteca, S.A.B. de C.V., Patricia Chapoy, and Publimax, S.A. de C.V. (the "Media Defendants"), complain in this accelerated interlocutory appeal that the trial court erred in denying their special appearance in a suit brought by appellees, Gloria de los Angeles Trevino Ruiz (aka "Gloria Trevi"), individually and on behalf of her minor child, Gabriel de Jesus Trevino, and Armando Ismael Gomez Martinez (the "Trevi Parties"). *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(7) (West 2008); TEX. R. APP. P. 28.1. Appellants contend by five issues, that the trial court erred by: (1) denying their special appearance; (2) finding that it had specific jurisdiction over the Media Defendants; (3) finding that it had general jurisdiction over the Media Defendants; (4) finding that exercising personal jurisdiction over the Media Defendants would not offend traditional notions of fair play and substantial justice; and (5) overruling the appellants' objections to the affidavit testimony of Francisco Peña[1], the affidavit and deposition testimony of Patti Sunday, the deposition testimony of Othon Frias Calderon, and the deposition testimony of Vicente Diaz. We affirm.

## I. STANDARD OF REVIEW

Whether the trial court has personal jurisdiction over a defendant is a question of law. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). The plaintiff bears the initial burden of pleading "sufficient allegations to bring a nonresident defendant within the provisions of the [Texas] long-arm statute." *Id.* at 793. However, when a defendant files a special appearance, he assumes the burden of negating all bases of personal jurisdiction asserted by the plaintiff. *Moki Mac River Expeditions v.*

---

[1] We have not reviewed Peña's affidavit for purposes of this appeal. Therefore, we need not consider whether the trial court improperly overruled appellants' objections to Peña's affidavit. *See* TEX. R. APP. P. 47.1 (stating that an appellate court must address every issue necessary for final disposition of appeal).

2

*Drugg*, 221 S.W.3d 569, 574 (Tex. 2007); *BMC Software*, 83 S.W.3d at 793; *El Puerto de Liverpool, S.A. de C.V. v. Servi Mundo Llantero, S.A. de C.V.*, 82 S.W.3d 622, 628 (Tex. App.—Corpus Christi 2002, pet. dism'd w.o.j.). The trial court determines the special appearance by referring to the pleadings, any stipulations made by and between the parties, any affidavits and attachments filed by the parties, discovery, and any oral testimony. TEX. R. CIV. P. 120a(3).

When the trial court issues findings of fact and conclusions of law, we may review the findings of fact for legal and factual sufficiency. *BMC Software*, 83 S.W.3d at 794. We review a trial court's legal conclusions de novo. *Moki Mac*, 221 S.W.3d at 574 (citing *BMC Software*, 83 S.W.3d at 794). The appellant may not challenge the trial court's conclusions of law as factually insufficient; however, the appellate court may "review the trial court's legal conclusions drawn from the facts to determine their correctness." *Id.*

If the trial court does not issue findings of fact and conclusions of law, we must imply all facts necessary to support the judgment if those facts are supported by the evidence. *BMC Software*, 83 S.W.3d at 795 (citing *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990); *Zac Smith & Co. v. Otis Elevator Co.*, 734 S.W.2d 662, 666 (Tex. 1987); *In re W.E.R.*, 669 S.W.2d 716, 717 (Tex. 1984)). "When . . . the trial court does not issue fact findings, we presume that the trial court resolved all factual disputes in favor of its ruling." *Glattly v. CMS Viron Corp.*, 177 S.W.3d 438, 445 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (citing *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 805–06 (Tex. 2002)). However, "we review de novo if the underlying facts are undisputed or otherwise established." *Preussag Aktiengesellschaft v.*

3

*Coleman*, 16 S.W.3d 110, 113 (Tex. App.—Houston [1st Dist.] 2000, pet. dism'd w.o.j.). Any implied findings are not conclusive and may be challenged for legal and factual sufficiency if the appellate record contains the reporter's and clerk's records. *Id.* "For legal sufficiency points, if there is more than a scintilla of evidence to support the finding, the no evidence challenge fails." *Id.*

## II.    PERSONAL JURISDICTION

Texas courts have personal jurisdiction over a nonresident defendant only if it is authorized by the Texas long-arm statute, *see* TEX. CIV. PRAC. & REM. CODE ANN. § 17.042 (West 2008), which allows Texas courts to exercise personal jurisdiction over nonresident defendants who are doing business in Texas. *Id.*; *BMC Software*, 83 S.W.3d at 795. The Texas long-arm statute sets out several activities that constitute "doing business" in Texas; however, the list is not exclusive, and Texas's long arm statute's "broad language extends Texas courts' personal jurisdiction 'as far as the federal constitutional requirements of due process will permit.'" *BMC Software*, 83 S.W.3d at 795 (quoting *U-Anchor Adver., Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex. 1977)). Therefore, "the requirements of the Texas long-arm statute are satisfied if the exercise of personal jurisdiction comports with federal due process limitations." *CSR Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex. 1996).

Under the Due Process Clause of the Fourteenth Amendment of the United States Constitution, a Texas court has personal jurisdiction over a nonresident defendant when (1) the nonresident defendant has established minimum contacts with the forum state, and (2) the exercise of jurisdiction does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316

4

(1945); *BMC Software*, 83 S.W.3d at 795; *see* U.S. CONST. amend. XIV, § 1. "The exercise of personal jurisdiction is proper when the contacts proximately result from actions of the nonresident defendant which create a substantial connection with the forum state." *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991).

Minimum contacts may be found when the nonresident defendant purposefully avails himself of the privileges and benefits inherent in conducting business in the forum state.[2]  *Moki Mac*, 221 S.W.3d at 575 ("[A] defendant must seek some benefit, advantage or profit by 'availing' itself of the jurisdiction.") (quoting *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005)); *Michiana*, 168 S.W.3d at 784 ("For half a century, the touchstone of jurisdictional due process has been 'purposeful availment.'"); *see Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–75 (1985). Minimum contacts with the forum state may establish either specific or general jurisdiction over the nonresident defendant. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984). There is specific jurisdiction over the nonresident defendant if the defendant purposefully directed his activities at residents of Texas and the litigation arose from or related to those contacts. *See Burger King*, 471 U.S. at 472; *Helicopteros*, 466 U.S. at 414; *Guardian Royal*, 815 S.W.2d at 227. In other words, there must be a substantial connection between the nonresident defendant's contacts

---

[2] In determining whether purposeful availment has occurred, there are three considerations. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (2005). First, we consider only the nonresident defendant's contacts with the forum state. *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) ("This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of . . . the 'unilateral activity of another party or a third person.'")). Second, we consider whether the contacts were purposeful and not "random, isolated, or fortuitous." *Id.* Finally, we consider whether the nonresident defendant sought "some benefit, advantage, or profit by 'availing' itself of the jurisdiction." *Id.*

and the operative facts of the litigation.  *Moki Mac*, 221 S.W.3d at 585.  The forum state has general jurisdiction over the nonresident defendant if the defendant's contacts in the forum state are continuous and systematic.  *BMC Software*, 83 S.W.3d at 796.  General jurisdiction allows the forum state to exercise personal jurisdiction over the defendant "even if the cause of action did not arise from or relate to activities conducted within the forum state."  *Id.*

### III.   PERSONAL JURISDICTION IN DEFAMATION SUITS

In determining whether the nonresident defendant that is sued for defamation has had minimum contacts with the forum state, the United States Supreme Court has provided a framework for courts to follow.  *See Calder v. Jones*, 465 U.S. 783 (1983); *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1983).   In *Keeton*, the United States Supreme Court overturned the lower court's dismissal of the plaintiff's libel cause of action against the publisher of a magazine.  *Keeton*, 465 U.S at 772.  The plaintiff, who was not a resident of New Hampshire, sought relief in New Hampshire because the statute of limitations had run in her home state.  *Id.* at 773.  The Supreme Court held that the defendant's "regular circulation of magazines in [New Hampshire] is sufficient to support an assertion of jurisdiction in a libel action based on the contents of the magazine."  *Id.* at 773–74.  The Court citing the lower court's findings stated that "[t]he general course of conduct in circulating magazines throughout the states was purposefully directed at New Hampshire, and inevitably affected persons in the state." *Id.* at 774.  The Court explained that

> [s]uch regular monthly sales of thousands of magazines cannot by any stretch of the imagination be characterized as random, isolated, or fortuitous.   It is, therefore, unquestionable that New Hampshire's jurisdiction over a complaint based on those contacts would ordinarily

6

satisfy the requirement of the Due Process Clause that a State's assertion of personal jurisdiction over a nonresident defendant be predicated on 'minimum contacts' between the defendant and the State.

*Id.*

The Supreme Court explained that the plaintiff's lack of contacts with the forum state did not defeat jurisdiction because we analyze the relationship among the defendant, the forum state, and the litigation. *Id.* at 775–76. The Court found the plaintiff's claims that she suffered damages in multiple states relevant to the question of whether it was "fair" to compel the defendant to defend a multi-state suit in New Hampshire. *Id.* at 776. However, the Supreme Court held her multi-state claims did not defeat New Hampshire's jurisdiction over the defendant because New Hampshire had a legitimate interest in holding the defendant answerable on a claim related to the defendant's activities of circulating its magazine in that state. *Id.* The Court explained that New Hampshire has a significant interest in redressing injuries that actually occur within its borders. Quoting *Leeper v. Leeper*, 114 N.H. 294, 298 (1974), the Supreme Court stated:

> A state has an especial interest in exercising judicial jurisdiction over those who commit torts within its territory. This is because torts involve wrongful conduct which a state seeks to deter, and against which it attempts to afford protection, by providing that a tortfeasor shall be liable for damages which are the proximate result of his tort.

*Keeton*, 465 U.S. at 776 (internal citations omitted). The Court explained that this interest "extends to libel actions brought by nonresidents" and that New Hampshire has an interest in discouraging the deception of its citizens in a libel action. *Id.* The Supreme Court said, "False statements of fact harm both the subject of the falsehood *and* the readers of the statement" and "there is no constitutional value in false

7

statements of fact." *Id.* (emphasis in original). The Court determined that New Hampshire had an interest in remedying an injury that in-state libel caused within its borders to a nonresident and that "the tort of libel is generally held to occur wherever the offending material is circulated." *Id.* at 776–77.

Noting that the defendant had "chosen to enter the New Hampshire market[,]" the Court concluded that the defendant could be "charged with knowledge of its laws." *Id.* at 779. The defendant's activities could not be regarded as continuous and systematic and were not so substantial as to support jurisdiction over a cause of action unrelated to its activities in New Hampshire. *Id.* However, the defendant was "carrying on a 'part of its general business' in New Hampshire, and that [was] sufficient to support jurisdiction when the cause of action [arose] out of the very activity being conducted, in part, in New Hampshire." *Id.* at 779–80.

The Supreme Court recognized that in some situations, the plaintiff's residence may be relevant to a minimum contacts analysis because the relationship between the defendant and the plaintiff's residence may "enhance" the defendant's contacts with the forum state, especially if the plaintiff's residence is the focus of the defendant's activities related to the suit. *Id.* at 780. However, an appellate court is not required to take the plaintiff's residence into consideration when determining whether the defendant has had minimum contacts with the forum state. *Id.* This is because the plaintiff's lack of residence "will not defeat jurisdiction established on the basis of [the] defendant's contacts." *Id.* The Court concluded that when a defendant has "continuously" and deliberately "exploited" a forum state's market, "it must reasonably anticipate being haled into court there in a libel action based on the contents of its magazine." *Id.* at

8

781. The Court stated, "There is no unfairness in calling [a defendant] to answer for the contents of [its] publication wherever a substantial number of copies are regularly sold and distributed." *Id.*

In *Calder v. Jones*, the Supreme Court found that California had personal jurisdiction over an editor and writer for the National Enquirer who were based in Florida. 465 U.S. at 790. At the time, Shirley Jones was an entertainer living and working in California, and the National Enquirer published allegedly defamatory statements about her. *Id.* at 788–89. The Supreme Court found that California was the focal point of the published story and the harm was suffered in California. *Id.* at 789. Thus, the Court stated that California had jurisdiction based on the "effects" of the defendants' Florida conduct in California. *Id.* The Supreme Court explained that (1) the story concerned the California activities of a California resident, (2) the plaintiff's career was centered in California, (3) the article was drawn from California sources, and (4) the brunt of the harm was felt in California. *Id.* at 788–89.

The *Calder* defendants argued that they were similar to welders who had built a boiler in Florida and who had no control over where the manufacturer sold the boilers. *Id.* at 789. The Supreme Court rejected that argument because according to the Court, the defendants were not charged merely with untargeted negligence. *Id.* Instead, the defendants had been charged with intentional and tortious actions expressly aimed at California. *Id.* The Supreme Court stated that the defendants knew that the brunt of the injury would be felt by Jones in the state in which she lives and works and in which the National Enquirer had its largest circulation. *Id.* Under the circumstances, the Supreme Court found that the defendants must have "reasonably anticipate[d] being haled into [a]

9

court [where the plaintiff lived and worked and the publication was disseminated]" to answer for the truth of the statements made in their article. *Id.* at 789–90. The Supreme Court reasoned that in the case of an intentional tort, such as defamation, an individual injured in California should not be required to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California. *Id.* at 790.

## IV.  THE EVIDENCE

The Trevi Parties sued appellants for defamation, libel per se, slander, defamation per se, business disparagement, civil conspiracy, and tortious interference with existing and prospective contracts and business relationships. The Trevi Parties claimed that appellants allegedly broadcast defamatory statements about them on their television programs. In their joint special appearance, TV Azteca, S.A.B. de C.V. ("Azteca") and Chapoy asserted that they are not residents of Texas, that they have not had minimum contacts with Texas allowing jurisdiction in Texas, the trial court lacked specific and general jurisdiction over them, and jurisdiction over them would offend traditional notions of fair play and substantial justice. Azteca stated that it is not registered to do business in Texas and that it is an entity that has not been formed under the laws of Texas. Azteca and Chapoy challenged all of the bases for jurisdiction listed in the Texas long-arm statute.

Chapoy stated that she is a citizen and resident of Mexico employed by a Mexican corporation. Chapoy claimed that her "intended viewership includes primarily Mexican viewers, not viewers in Texas." Chapoy asserted that the evidence presented showed that she has not (1) engaged in business in Texas; (2) agreed to be subject to jurisdiction in Texas; (3) appointed an agent for service of process in Texas; (4) ever

10

maintained a place of business in Texas; (5) owned property in Texas; (6) owed or paid any taxes to the State of Texas or any of its political subdivisions; (7) filed a lawsuit in Texas; or (8) been a party to a lawsuit other than the current action.

In its special appearance, Publimax stated that: (1) it is an entity formed under the laws of Mexico; (2) it was not formed under Texas laws; (3) it was not registered to do business in Texas (4) it did not have employees, agents, or assets, representatives, or offices in Texas; (5) it did not engage in business in Texas; (6) it did not agree to be subjected to jurisdiction in Texas; (7) it had not appointed an agent for service of process in Texas; (8) it had not maintained a place of business in Texas, owned property in Texas, or owed or paid any taxes to Texas or any of its political subdivisions; (9) it had not "aim[ed] or target[ed] any alleged defamatory broadcast to the State of Texas"; and (10) it had not "create[d], [written], or produce[d] any allegedly defamatory broadcast." Publimax acknowledged that it operated "over-the-air television channels 7 and 13 in Monterrey, Mexico" but alleged that "pursuant to an agreement with the owner of those stations, the programming broadcast over those channels is directed at viewers in the northeast zone of Mexico not Texas." Publimax stated that "[c]hannels 7 and 13 in Monterrey are licensed for broadcast by the Mexican government, not the U.S. Federal Communications Commission." Publimax recognized that households in southern Texas are capable of receiving transmission of broadcasts from channels seven and thirteen, but it claimed that it had not "engage[d] in purposeful attempts to do business in south Texas through programming targeted or directed to south Texas." Publimax also stated that it did not have sufficient minimum contacts with Texas conferring jurisdiction to a Texas court.

Regarding general jurisdiction, appellants stated that the Trevi Parties "acknowledge[d] that [they] do 'not maintain a registered agent for service of process in Texas.'" Appellants claimed that the Trevi Parties' accusation that they are "doing business in the State of Texas and [were] at all times material hereto doing business in Texas" was conclusory and did not constitute evidence of continuous and systematic contacts sufficient to vest the trial court with jurisdiction over them. Appellants alleged that the Trevi Parties failed to state which defendant actually broadcast the television programs in Texas, which gave rise to the Trevi Parties' causes of action. Finally, appellants claimed that even if Azteca broadcast the television programs at issue, that fact alone is not sufficient to confer general jurisdiction in Texas.

Regarding specific jurisdiction, appellants stated that the Trevi Parties' allegation that they had directed their activities to Texas residents was vague and the type of evidence rejected by the Texas Supreme Court. Appellants argued that even if Azteca broadcast its programs to Texas, those broadcasts were incidental and not directed to the state of Texas. Finally, appellants asserted that vesting a Texas court with jurisdiction over them would offend traditional notions of fair play and substantial justice.[3]

Azteca and Chapoy attached Othon Frias Calderon's and Chapoy's affidavits to their joint special appearance wherein Calderon stated that he is employed as an "attorney-in-fact" for Azteca and is "familiar with and [has] knowledge of [Azteca's] business." Calderon stated:

> I have knowledge that the intention of [Azteca] in supervision, producing and conducting the television programming at issue in this lawsuit was to

---

[3] On appeal, appellants have not challenged the sufficiency of the Trevi Parties' pleadings.

accurately inform in a truthful, objective and professional manner about the matters reported therein. The programs contain reporting and commentary on the legal proceedings related to Gloria Trevi and Sergio Andrade, among others, which occurred mainly in Mexico, Europe, and Brazil, and have no relationship to the State of Texas. The producers, reporters and investigators involved in the production of programs did not include or discuss any act or event taking place in the State of Texas and did not rely on any sources in the State of Texas. All of the work on the subject broadcasts was performed and conducted in Mexico.

In her affidavit, Chapoy stated that she is a resident of Mexico and has never been a resident of Texas. Chapoy said that she serves as director of entertainment for Azteca. According to Chapoy, she intends that viewers of the programs she produces consist of Mexican citizens, and she does not intend for residents of Texas to view her reports. Chapoy stated, "The report that I understand to be the subject of Plaintiff's Original Complaint [was] investigated, written and prepared by me and colleagues working in Mexico. All of my work on the subject broadcasts were performed and conducted in Mexico." Chapoy said that she intended to "accurately" inform her viewers about the matters reported in the broadcasts that "focused on cases and legal proceedings involving Gloria Trevi which took place in Mexico, Europe and Brazil and not in the State of Texas." According to Chapoy, the reports "did not discuss any Texas events involving Ms. Trevi or others and did not rely on any sources in the State of Texas."

Publimax offered the affidavit of Vicente Diaz Charles ("Diaz").[4] Diaz works as the controller at Publimax. Diaz denied that Publimax has engaged in any acts listed in the Texas long-arm statute. Diaz stated:

---

[4] Diaz is also referred to as "Vicente Diaz" in the record. We will refer to him as "Diaz" because during his deposition, the attorneys referred to him as "Mr. Diaz."

13

The television programming that is the subject of the Petition was not created, written or produced by Publimax. Publimax did not have any responsibility for or role in preparing the content of that programming and did not exercise any editorial control or decision making regarding that content. Publimax did not aim or target any alleged defamatory broadcast to the State of Texas. The subject programming originated from a national Mexican television network which was responsible for creating the content of the programming and which exercised editorial control over the content of the programming. Publimax operates over-the-air television Channels 7 and 13 in Monterrey, Mexico pursuant to an agreement with the owner of those stations; however, the programming broadcast over those channels is directed at viewers in the northeast zone of Mexico, not Texas. Channels 7 and 13 in Monterrey are licensed for broadcast by the Mexican government, not the U.S. Federal Communications Commission.

. . . .

Although some households located in south Texas may have the capability of receiving the over-the-air television signal of channels 7 and 13 in Monterrey operated by Publimax as a result of signal "spill-over", that is the result of the over-the-air signal following the law of physics, not man-made laws as to borders and jurisdiction. Publimax has not and does not engage in purposeful attempts to do business in south Texas through programming targeted or directed to south Texas.

Appellants attached excerpts from depositions of Trevino, Calderon, Chapoy, Diaz, and Armando Ismael Gomez to their designation of deposition testimony, additional affidavits and expert witnesses in support of special appearances. To their response to appellants' special appearances, the Trevi Parties attached excerpts from: (1) Diaz's depositions taken on November 15, 2011 and March 8 and 9, 2012 with deposition exhibits; (2) Calderon's deposition with exhibits; (3) Chapoy's deposition with exhibits; (3) Trevi's deposition; (4) Laura Cantu's deposition; and (5) Patti S. Sunday's deposition. The Trevi Parties also offered a variety of documents, including among other things: (1) Francisco J. Peña Valdés's affidavit; (2) Patti S. Sunday's affidavit; (3) Trevi's affidavit; (4) portions of TV Azteca's 2005, 2006, 2007, 2008, and 2009 annual reports; (5) documents in a lawsuit filed by a Texas resident against Publimax and its

14

employee; (6) a "Linkendine" profile of TV Azteca's manager of editing, post production, and signal distribution, Omar Garza Galvan, and an invoice; (7) a printout of pages from TV Azteca Noreste's website; (8) Rebecca Vela's affidavit; (9) Raymond L. Thomas's affidavit; and (10) Vanessa Villegas's affidavit.

Both the Trevi Parties and appellants provided excerpts of Trevi's deposition.[5] During her deposition, Trevi testified that she lives in McAllen, Texas and is in the United States under a work visa. Trevi testified that she viewed one of the broadcasts containing the allegedly defamatory statements at her mother-in-law's home in McAllen. Trevi claimed she sued appellants in Texas because the defamatory statements harmed her and her family economically in Texas. Trevi stated that she lost business in Texas due to the broadcasts.

Trevi stated that she did not know whether appellants "did anything in Texas to prepare" the allegedly defamatory broadcasts and did not know if the preparation of the broadcasts occurred in Mexico. Trevi agreed with appellants' attorney that several of the alleged defamatory remarks concerned incidents that occurred in Mexico and had not occurred in Texas. She also agreed that several of the remarks concerned incidents that occurred in Brazil. Trevi stated that she did not know where the programs "aired." Trevi could not say whether Chapoy made the allegedly defamatory statements in Mexico. Trevi explained:

> Well, look, I saw it here [in Texas]. I saw it here on TV Azteca, and I do not know where this woman records her show or where the people who are being interviewed are. But they pay a lot of money to people to give interviews to defame me and they have even said that in their own show.

---

[5] We have summarized the portions of Trevi's deposition provided by both sides together.

I don't know where she is recording her show or where these people who are being interviewed are or where the reporters are when these interviews are taking place. I know that I saw it here in McAllen. I actually don't watch TV Azteca, but people who saw it called me up and told me to turn to that channel to—to watch it because they were attacking me.

. . . .

I don't want to make any assumptions. I don't want to say "yes" or "no." I simply saw this woman making the statements. I don't know where she is recording her show.

Appellants' attorney asked Trevi to explain what she saw including the title of the program and the date that it ran. Trevi responded:

Well, in the show Ventaneando, I don't remember the exact date. I received a call from Aunt Mapy and from my Aunt Luisa. The calls were minutes apart. I don't remember who called first, but they called to say that they were talking about me on TV Azteca because they live here. So I changed the channel and I saw that they were advertising this series, this show that was a series saying something like ten years after my release.

And statements were being made by people with interest in that advertising. People who are interested to cause me harm, and [Pati] Chapoy was giving credibility to those statements and making affirmations about what was being said. There were also reporters talking about it as well. They were advertising this series of shows that were supposed to be talking about something like the dark side of my release, and they were making affirmation or supporting all these false statements about me.

These false statements and a good portion of them are right there from the beginning of the lawsuit that I personally saw myself and some from around midway into the lawsuit.

Trevi testified that her Aunt Luisa lives in McAllen "very close to [her] mom's house." However, Trevi did not know the address. Trevi believed that she saw the program sometime in 2009 before she filed the lawsuit.

Trevi stated that she does not know where Publimax's regular place of business is located. When asked if appellants interviewed her in Texas regarding the complained-of broadcasts, Trevi replied, "No." Trevi acknowledged that Chapoy had

16

previously interviewed her in Mexico and that she has never met or seen Chapoy in Texas. When asked if any of appellants' sources were interviewed in Texas, Trevi responded, "I cannot say 'yes' or 'no' because I don't have a certainty. I do not know where those statements were made by them. I am not certain as to whether they were made here [in Texas] or over there [in Mexico]." In response to whether she had seen or met a representative from Publimax in Texas before her deposition, Trevi said, "Well, I—I couldn't say because I have seen reporters and people from TV Azteca here." Trevi stated that she had not met or seen Chapoy in Texas.

When asked if she had ever been interviewed by any employee or representative of TV Azteca in Texas, Trevi replied, "They have tried, but I have not agreed to give them an interview." Trevi explained, "During public activities that I might be involved in or they—they have tried to intercept me at a restaurant or when my son was born." When asked if she had "contact with TV Azteca in Texas," Trevi said, "I have not accepted their coming close to me." Appellants' attorney asked, "Right. Which means that you never have had any contact with TV Azteca in Texas, correct?" Trevi responded, "That's incorrect. They have approached me, putting their microphones in front of my face; and I have refused to give them an interview." When asked to provide details of one incident where this occurred in Texas, Trevi stated, "At the hospital after my son was born. They have tried it [with] my family at my mom's different houses, at Tony Roma's restaurant some years ago, at the airport. On several occasions before filing this lawsuit." Appellants' attorney asked Trevi why she believed TV Azteca knew where she lived despite her testimony that she did not divulge that information to the public. Trevi replied, "Because as I said before, they were practically camping outside

17

my mom's house. And they themselves say it that way in some of the shows: 'We are right here, right outside Gloria Trevi's mother's house.'"

When appellants' attorney asked why Trevi brought her lawsuit in Texas, Trevi responded:

> Well, I am filing this lawsuit, as you can see, because of the harm that has been caused to me. These people know, they have made the statements and these broadcasts knowing that I live in McAllen, and they are making the shows where they get broadcasted here in the state and they get broadcasted all over the United States. It doesn't only harm me, but it— also my family and also my—my work.
>
> These people very well know those shows and those statements get broadcasted here. And I am not doing this—I'm not filing this lawsuit because I'm angry, but it's out of love and protection for my children. Because this doesn't only hurt me, but it hurts them as well. They suffer from comments made in school.
>
> And independently from the harm to my work, these people and this company have caused fear upon me, fear for my freedom. My freedom is again being threatened, and they are doubting and putting my innocence and acquittal to be judged by others.
>
> These shows are—were seen here. I saw them here. I heard about them here while I was here in my house. I have a son who is from here, from McAllen, and my children are here studying here in McAllen. So that's why I decided to get legal help here in the United States because I believe in the justice of this country.

Appellants' attorney objected to Trevi's response on the basis that it was nonresponsive and asked her "You made reference to—that the Defendants allegedly know that you live in McAllen. What evidence do you have of that?" Trevi responded:

> Well, I am being followed or prosecuted by them, by the reporters and their cameras. Even when my son was born that was mentioned earlier and also commented earlier about my husband's problem. They are making an effort to document with their comments my husband's problems, and they very well know and it is very clear that they know that I'm here in McAllen, in the United States.
>
> . . . .

18

I am not assuming that [they know]. I know they know that I live here.

Trevi testified that while watching TV, she saw that a reporter from TV Azteca named Laura Suarez was following her and her family in Texas. Appellants' attorney asked, "Have you ever seen Laura Suarez physically present through your own eyes in Texas? Yes or no?" Trevi said, "When I see a TV Azteca camera, I turn around. I do not face the camera. I have—but I have been told that she has been present, both by my family and by the people who are accompanying me. So, I don't face the camera. I don't look at the reporter." Trevi clarified that she did not believe she had ever personally seen Laura Suarez in Texas.

Trevi explained how she was harmed in Texas as follows:

Well, there have been issues about concerts, concerts that were being prepared, things were being prepared for the concerts; and after these comments, everything got cut off.

I have been having a real problem registering my children to a club. I want to be with them in a club here in Texas, and we have not been accepted because of all these things that were said about me.

. . . .

These concerts were not only here [in McAllen], but also in other cities such as Houston, San Antonio, Dallas. Independently from the economic harm, maybe the economic issue is most important to TV Azteca, but there's also psychological harm to my children. Emotional distress or harm to me and—and my family, among others.

. . . .

[C]omparing my normal activity after I retook my career, my artistic career both in Mexico and the United States, the number of concerts that—that I was having changed after this interview—rather, these shows that were broadcasted. Projects such as an energy drink that was stopped and other projects that had to do with perfumes and using my image. All this stopped.

19

. . . .

I knew that we were preparing for appearances, for a tour in Texas. And it didn't happen after the broadcast.

At his deposition, Calderon testified that TV Azteca "operates a national TV station—Mexican TV station." When asked if TV Azteca has an ownership interest in several different companies, Calderon replied, "Yes."[6] However, according to Calderon those companies are not related to the operation of the national television station. Calderon agreed with the Trevi Parties' attorney's statement that Azteca America is a "wholly-owned subsidiary of TV Azteca" and said that Azteca America is an American company.[7] The Trevi Parties' attorney asked if TV Azteca owned "the channel known as Azteca 13," and Calderon responded, "They are not the owners, but they have a license to operate from—from the Mexican government." When asked who owns Azteca 13, Calderon said, "The owner of the station concessions is the Mexican government." Calderon stated that TV Azteca also has a license to operate Azteca 7 and that although he did not know the number of television stations TV Azteca has a license to operate, he thought there were "several around the Mexican Republic." The Trevi Parties' attorney told Calderon she understood that TV Azteca had licenses to operate over 300 television stations in Mexico. Calderon responded that he thought "there are less" and that all of the stations "are the property of the Mexican government."[8]

---

[6] The Trevi Parties and appellants attached portions of Calderon's deposition to their respective motions and responses. We have reviewed and summarized the excerpts of Calderon's deposition provided by the Trevi Parties and appellants together.

[7] Calderon stated that he did not believe that TV Azteca owned any other American companies besides Azteca America.

[8] We note that appellants complain on appeal that the trial court overruled their objections to

20

When asked if TV Azteca owned or operated the television station Azteca Noreste, Calderon said, "I understand that TV Azteca Noreste doesn't exist; and about Publimax, we have no ownership." Calderon stated that "at present" as he understood it, TV Azteca did not have any ownership interest in the name TV Azteca Noreste. When asked if TV Azteca had ever owned an interest in TV Azteca Noreste, Calderon replied, "As I understand it, and I see that it doesn't exist, I would need to review documents from the past."

Calderon explained that TV Azteca has an agreement with Publimax which limits where Publimax can broadcast TV Azteca's programming to three Mexican states of Nuevo Leon, Coahuila, and Tamaulipas. Calderon stated that Publimax is the only company allowed to broadcast TV Azteca programming in those states and that Publimax pays TV Azteca a fee for the broadcasting rights.

Calderon testified that some of the programs that are broadcasted by Publimax on TV Azteca 7 and 13 "are produced by TV Azteca [and] are the property of TV Azteca. Others, they are bought programs from other companies from different countries." Calderon stated that TV Azteca owned the right to the programs, "Ventaneando," "Ojo del Huracan," and "Vidas al Limite."

Calderon stated that there is no agreement between TV Azteca and Publimax for Publimax to broadcast TV Azteca's programs in the United States of America. Calderon said, "I understand that in order to be able to broadcast in the U.S., you [are] require[d]

pages 25–27 and 32 of Calderon's deposition testimony. Appellants also complain that the trial court should not have considered evidence that a TV Azteca reporter attended the Super Bowl in 2011. However, we have not considered the above-mentioned testimony and documents in our determination of whether the trial court should have granted appellants' special appearance. Therefore, we need not determine whether it was error for the trial court to overrule appellants' objections to this portion of Calderon's deposition. *See* TEX. R. APP. P. 47.1.

21

[to have] a license or a permit from the F—FCC, which is the telecommunications authority in the United States." Calderon said that TV Azteca does not own any towers in the United States and "only has licenses in Mexico." When asked, "The towers that transmit the signal from television, TV Azteca that are located in Mexico, is that signal broadcast into the United States," Calderon replied, "Not that I know of. I'm not a technician, neither I know too much about technology; but there is—it's possible, or I have heard that the signals can be—expanded . . . without anybody's control." When asked if TV Azteca's signal is transmitted to Texas, Calderon clarified that TV Azteca's signals are transmitted only in Mexico but that it is possible that "due to technical issues" the signal may be transmitted to "other places."

Calderon testified that TV Azteca neither owns nor operates any television stations in the United States of America. When asked if the programs produced by TV Azteca are shown in the United States, Calderon responded, "It's possible." When asked if Publimax broadcasts programming from TV Azteca, Calderon replied, "They can." The Trevi Parties' attorney asked Calderon if that programming is broadcast in the United States through Azteca America, and Calderon stated that "TV Azteca gives license to Azteca America for certain programs in the United States." Calderon did not know whether TV Azteca received any portion of the income from Azteca America's programming. Calderon did not "think" that TV Azteca received any portion of the income from advertisements on Azteca America.

Calderon's affidavit stated that "TV Azteca operates television stations in Mexico pursuant to a concession issued by the government of . . . Mexico." According to Calderon' affidavit, TV Azteca had never had a license to operate in the United States of

22

America and produces programs only for audiences in Mexico. Calderon stated that "Azteca International Corporation [("AIC")] is a wholly-owned subsidiary of TV Azteca" that is organized under the laws of Delaware with its headquarters in California. Calderon said that AIC is a separate entity from TV Azteca and that TV Azteca has "contributed content licenses to AIC," which "allowed AIC to broadcast certain TV Azteca-owned programs, including 'Ventaneando,' and to use certain intellectual property of TV Azteca in the United States." Calderon stated that "AIC uses this license to retransmit certain TV Azteca programming for distribution in the United States and to market itself in the United States. For instance, pursuant to the license, AIC utilizes original content from TV Azteca as 'Ventaneando' in order to distribute through its affiliates in the United States, a program known as 'Ventaneando America.'"

At his deposition, Calderon stated that to his knowledge, TV Azteca did not have any contracts with Echostar, Dish Network, or Direct TV in Texas. Calderon did not know whether TV Azteca had any contracts with Time Warner Cable in Texas. When asked, "Does TV Azteca provide any programming to the Rio Grande Valley through Time Warner Cable in Texas," Calderon responded, "No. My understanding is that, or what I know, is that TV Azteca, as I said before, gives licenses, other content to Azteca America, or to AIC. And then what AIC does is unknown to me in relation to other— cable companies."

Calderon clarified that "TV Azteca is the owner of [AIC], and Azteca America is a brand, which I believe is owned by [AIC]." When shown a logo of Azteca America, Calderon acknowledged that it used the same logo used by TV Azteca. Calderon affirmed that TV Azteca owns the trademark for the logo in Mexico and "also in other

23

countries." Calderon thought that TV Azteca had registered the trademark for the logo in the United States. Calderon believed that TV Azteca had given AIC a license to use the logo.

The trial court examined excerpts from Chapoy's deposition provided by appellants and excerpts provided by the Trevi Parties.[9] Chapoy testified that she "started" with TV Azteca "in September, 19 or 20 years ago." Chapoy stated that she had been a director of production for TV Azteca for about a year and then took over in her current position as director of entertainment. Chapoy agreed that she "launched" Ventaneando in 1996. Chapoy created other projects for TV Azteca including among others, Alfa Dance, Corazo Grupero, El Ojo del Huracan, Historias Emgarzadas, and Vidas al Limite. Chapoy did not recall which shows other than Ventaneando discussed Trevi and her husband.[10] When asked if El Ojo del Huracan discussed Trevi, Chapoy replied, "Probably, yes."

Chapoy agreed that Ventaneando has "been broadcast continuously by TV Azteca for 16 years" for five days per week. Chapoy affirmed that she had been a producer for Ventaneando in the past. Chapoy testified that Ventaneando, Ojo del Huracan, and Vidas al Limite are broadcast in Mexico on Channel 13. Chapoy did not know whether Ventaneando is also available on Azteca America channels. Chapoy stated that she receives no compensation from Azteca America. When asked, "What is Ventaneando America," Chapoy said, "I don't know" and denied any involvement in that

---

[9] Appellants and the Trevi Parties provided some of the same excerpts of Chapoy's deposition, and they also each provided different excerpts. We have reviewed both sets and have summarized them together.

[10] Later, during her deposition testimony, Chapoy denied that she created Ventaneando. She claimed that "[i]t was Carmen Arizmendi's idea." However, Chapoy acknowledged that she is the "principal" host of the program.

show.  However, after the Trevi Parties' attorney showed Chapoy a document marked Exhibit No. 2 for purposes of the deposition, Chapoy acknowledged that she had recently served as the host of the anniversary of Ventaneando on Azteca America.

Exhibit No. 2 is a press release from Azteca America dated May 10, 2011, entitled "Azteca America Celebrates 15 Years of the Best Entertainment News Program on Spanish-Language Television: Ventaneando."  The document states that "[t]hroughout the month of May, Azteca America will celebrate the 15-year anniversary of the best Spanish-language entertainment news program and a pioneer of the genre—Ventaneando America hosted by Pati Chapoy with her incomparable team of experts:  Daniel Bisogno, Pedro Sola, Atala Sarmiento, and Jimena Perez.  The press release states:

> After 15 years of broadcasting in Mexico and nearly 7 years of airing its exclusive version for Spanish-speaking viewers in this country, *Ventaneando America* has earned a reputation for being the first program to break celebrity news and show business gossip.  "We work very hard to find the sort of information that isn't readily made available in a press conference or in interviews.  We investigate what is happening everywhere from every angle and that is an enormous challenge," said Chapoy.

> "For Azteca America it is an honor to celebrate Ventaneando, one of the most successful and influential programs in Mexico, the United States, and other Latin American countries, as led by the outstanding journalist, Pati Chapoy, who is an icon in the entertainment world.  Congratulations on these 15 years of continuous broadcasts and best wishes for continued success in the future; this is the only program capable of high-impact exclusive coverage of important events and interviews of top stars," stated Alberto Santini Lara, Vice President of Production, Programming, and Marketing for Azteca America as well as General Director of Azteca 13 and Azteca Novelas in Mexico.

> Last week, Pati Chapoy kicked off celebrating "15 Years" of her program Ventaneando with a spectacular remodeled set, which she dubbed her "casona" ("big house").  "I am happy to be Ventaneando and I feel proud of what we have accomplished in the first 15 years.  I feel happy to have a

phenomenal team and to continue producing an entertaining program that presents clear, truthful, objective, and timely information," added Pati Chapoy.

. . . .

In fine print the document stated the following:

About Azteca America

Azteca America is the alternative choice in broadcast television for Spanish speaking families residing in the United States. Azteca America operates in 66 markets nationwide, and can also be seen on DIRECTTV Mas Channel 441 (AZA 441) and DISH Network Channel 825. Wholly owned by Mexican broadcaster TV Azteca, S.A. de C.V., Azteca America has access to the best programming from Azteca's three national networks, including a library with over 200,000 hours of original programming and news from local bureaus in 32 Mexican states. The network complements Mexican programming with an innovative line-up of shows from international producers and distributors to ensure the finest programming for Spanish-speaking viewers and unique advertising solutions for partners seeking to reach the most dynamic market in the country.

The Trevi Parties' attorney asked Chapoy whether the press release indicated that she had hosted the program Ventaneando America. Chapoy agreed that the press release says she hosted Ventaneando America, and Chapoy stated, "When they ask me to do a special type of—act as an advisor for something specially, I do it." The attorney asked, "Right. So, what is Ventaneando America," and Chapoy said, "A promotion made by Asesores." The Trevi Parties' attorney stated, "And when I asked you earlier, what is Ventaneando America, and you said you don't know; the truth is you do know," and Chapoy replied, "The truth is that I do a lot of promotions. I have been doing promotions for 16 years, and I don't remember specifically any of them." Chapoy did not know whether the Ventaneando shown on Azteca America is the same or a different program that is shown on TV Azteca in Mexico.

26

Chapoy acknowledged that she is "well-known" in the United States and stated that she is also "well-known" in Argentina, Brazil, Latin America, "and some other parts of the world." When asked why she thought she had "so much recognition or fame in the United States," Chapoy said, "Because I have been working for many years as a journalist, and I started to work about 40 or more years ago with Raul Velasco. And ever since people know me, I was his assistant. I worked for him for 25 or 30 years." The Trevi Parties' attorney stated that the shows that Chapoy had created and produced and in which she appears "many of those are broadcast in the United States," Chapoy replied, "Okay. I understand—I highly understand that that's the way it is." The Trevi Parties' attorney asked, "And not only in the United States, but Texas in particular?" Chapoy responded, "I—I don't know—I assure you I can—I can assure you that I am not a systems engineering [technician], so I don't [know] . . . ."

Chapoy testified that she did not know that the Trevi Parties lived in McAllen. Chapoy stated that she did not recall ever saying that she had obtained evidence supporting her stories about the Trevi Parties from the United States, Chile, and Mexico. Chapoy denied obtaining any evidence from the United States when researching the story about the Trevi Parties.

Chapoy stated that her husband has a Merrill Lynch account in McAllen, Texas. Chapoy, however, claimed that she had no knowledge of any of the details regarding the account and had never contributed her money to the account. Chapoy stated that it was not a joint account and that her husband had merely "[written her] name there, that's all."

27

The Trevi Parties provided excerpts of Diaz's deposition testimony taken on November 15, 2011. In these excerpts, Diaz testified that Publimax has used the name of "TV Azteca Noreste" and that the name "TV Azteca Noreste" "belongs to TV Azteca."[11] Diaz explained that an agreement existed, which allowed Publimax to use the name "TV Azteca Noreste." Diaz testified that "TV Azteca Noreste" is used to identify the northeast region of Mexico in order to identify what area Publimax and TV Azteca agreed to cover.

The Trevi Parties' attorney showed Diaz a document marked "Exhibit No. 3" for purposes of his deposition. Exhibit No. 3 is a picture of a map purportedly taken from "Azteca Noreste's" website with graphs and information written in Spanish. The map appears to show areas of Coahuila, Nuevo León, "Sur de Texas," and Tamaulipas. There are two graphs next to the map. In one graph, the above stated regions are listed. Under the title "Sur de Texas," the following Texas cities are listed and then identified on the map with corresponding numbers: Brownsville, Eagle Pass, Edinburg, Harlingen, Laredo, McAllen, Mission, Pharr, Port Isabel, Rio Grande, San Benito, and Zapata. The other graph lists Nuevo Laredo, Tamaulipas, Coahuila, and Sur de Texas with columns labeled, "Personas," "Hogares," "Televidentes," and "TV Hogares." With a final row stating "Total Cobertura." The graph shows that each region is assigned a particular number for each category listed. For example, in the category of "Personas," Nuevo Leon has 4,352,783, Tamaulipas has 2,602,394, Cohuila has 2,077,627 and the "Sur de Texas" has 1,63,814 with the "Total Cobertura" of 10,665,618.

---

[11] The Trevi Parties' attorney asked Diaz a series of questions asking him to explain who owned the "trademark" to "TV Azteca Noreste," Diaz said, "It's a trademark that doesn't belong to Publimax, that belongs to TV Azteca but there's an agreement so Publimax can use it." However, when asked if TV Azteca owned the "trademark" to "TV Azteca Noreste," Diaz replied, "I already indicated that TV Azteca Noreste it's not a trademark. It's a commercial name."

The Trevi Parties' attorney asked Diaz, "[W]e see that there's an area for Coahuila, Nuevo Leon, South Texas, and Tamaulipas, correct," and Diaz responded, "That's correct." The Trevi Parties' attorney said, "And underneath the indication of South Texas, it indicates the cities of Brownsville, Eagle Pass, Edinburg, Harlingen, Laredo, McAllen, Mission, Pharr, Port Isabel, Rio Grande, San Benito and Zapata, correct," Diaz replied, "It's correct." The Trevi Parties' attorney stated, "And there's an indication under South Texas that the television viewers—can you tell me what that number there says," Diaz replied, "1,583,829.[12] Diaz stated that the number for Texas in the "TV Hogares" column was 576,914. The Trevi Parties' attorney asked, "Was there any advertisements run on the TV Azteca Noreste channels for local businesses or retailers in South Texas," Diaz responded, "Possibly, yes."

Diaz testified that he "thought" that Publimax had done business in Texas by buying equipment used for broadcasting. Diaz stated that he believed that Publimax had entered into contracts with persons or companies in Texas.

In excerpts from his deposition taken on March 8 and 9, 2012, provided by appellants and the Trevi Parties, Diaz reviewed some of Publimax's "in-house documents."[13] Diaz described four of the documents as being Publimax employees' requests for expenses for travel in Texas. Diaz explained that the employees' travels

[12] The column where this number appeared for the "Sur de Texas" is "Televidentes." No translation was provided.

[13] The Trevi Parties attached some of the same portions of Diaz's deposition taken on March 8 and 9, 2012 provided by appellants; however, some of Diaz's deposition provided by the Trevi Parties were not included in those excerpts provided by appellants. We have reviewed and summarized the excerpts of Diaz's deposition provided by the Trevi Parties and appellants together.

occurred "[b]etween 2005 and 2009. In 2005, for example, there were none. 2006, 2007, and 2008, there were none either. So, it's 2006 and 2007."[14]

Diaz reviewed a document he identified as "an invoice from Kevin Ler, for the rent of an apartment" in McAllen in "December of 2006 and January of 2007." Diaz explained Publimax employed Ler from 2006 through 2007 and that Ler rented the apartment in McAllen "[b]ecause at that time there was a project in order to cable the signal for Publimax." Diaz testified that Ler had been assigned to the project by Publimax and was working on a contract with "Warner," a cable company in McAllen.[15] According to Diaz, Ler's project was unsuccessful and Publimax abandoned it. When asked, "Did Publimax ever enter into any sort of written agreement or contract with Time Warner Cable," Diaz responded, "Not that I know of." When asked, "And the signal that you were attempting to provide over the cable network, was it the Mexican signal," Diaz said, "Yes."

Diaz stated that "TV Azteca Noreste" is a "commercial name" that is not registered in Mexico. According to Diaz, "Today, [Publimax does not] use TV Azteca. They use . . . Azteca Noreste."[16] When asked, "And who owns the rights to the name of Azteca Noreste," Diaz replied, "TV Azteca." Diaz first claimed that there was no specific agreement regarding Publimax's use of the name "Azteca Noreste." However, when asked, "What allows Publimax to use the name Azteca Noreste," Diaz responded, "A

---

[14] It is not clear what Diaz meant when he stated that there was no travel in 2006 and 2007 prior to stating "So, it's 2006 and 2007."

[15] When asked if the company was "Time Warner Cable," Diaz said, "I think so."

[16] Appellants' attorney then stated, "No. Azteca Noreste," and the interpreter said, "Azteca Noreste." We interpret this exchange to mean that Publimax uses the name, "Azteca Noreste," and we have deleted "TV" from his response.

contract, a mercantile agreement." Diaz agreed that the contract was also a licensing agreement that Publimax has with TV Azteca. Diaz explained that the contract allowed Publimax "[t]o make air time in the northern part of the Mexican [R]epublic at certain times for Channels 7 and 13, TV Azteca [C]hannels 7 and 13."

Diaz agreed with the Trevi Parties' attorney when she said, "All right. And Exhibit No. 3 shows that there are services of the television signal to Coahuila, Nuevo Leon, South Texas, and Tamaulipas; is that correct?" However, Diaz clarified "that in the southern part of Texas the signal is only an air signal." Diaz agreed that Publimax has a website for "Azteca Noreste" that shows that "there's a signal provided to the southern part of Texas." Diaz claimed it was "just an accident" and said, "It's not controlled by Publimax." When asked, "But Publimax advertises that its air signal reaches the southern part of Texas, correct," Diaz said, "By error, yes." Diaz acknowledged that Exhibit No. 3 showed "the number of persons, homes, and televisions that are reached in the southern part of Texas."[17] Later during his deposition, the Trevi Parties' attorney asked Diaz, whether the "coverage area for Publimax's television broadcast signal [was] the same [in 2009] as it is today," Diaz replied, "I suppose so." The Trevi Parties' attorney asked, "And in 2009, was Publimax transmitting via air signal to the southern part of Texas," Diaz said, "As an accident, not voluntarily." The attorney stated, "And my question is whether or not Publimax was transmitting its signal via air, as you testified earlier, to the southern part of Texas in 2009," and Diaz replied, "Yes, as an

---

[17] During Diaz's deposition, the Trevi Parties' attorney represented that Exhibit 3 "was obtained from the website for Azteca Noreste." This appears to be the same exhibit referenced during Diaz's deposition taken on November 15, 2011 and previously explained.

31

accident." The attorney explained that she wanted a yes or no response, and Diaz said, "Yes."

Diaz denied that Publimax had solicited advertisers from Texas, but Diaz acknowledged that Publimax has advertisers from Texas who pay for commercial air time. Diaz acknowledged that Publimax had aired commercials from entities or businesses that are located in Texas from 1994, when it entered its agreement with TV Azteca, to the present. Diaz agreed that pursuant to its contract with TV Azteca, Publimax pays TV Azteca some percentage of the advertising revenues that it receives. However, according to Diaz, the amount of the percentage is confidential.

When asked, "Are the programs Ventaneando, or Ojo de Huacan, and La Vidas al Limite broadcast on the Publimax stations," Diaz replied, "I think, yes." Diaz stated that "Myriam Marlene" was "the representative of the sales agency," Xoana Entertainment. When asked if Marlene ever worked for Publimax, Diaz said, "As an advertising agency." Diaz testified that Publimax and Marlene had entered a "verbal agreement" with "the commercial director at that time. . . . [b]etween 2006 and 2007." Diaz explained that Marlene "would sell advertising to be broadcasted in Matamoros and Reynosa." When asked if she was selling advertising on behalf of Publimax, Diaz replied, "I think she was selling advertising on behalf of her agency." Diaz agreed that the advertising that Marlene sold was to be shown on Publimax stations in Matamoros, Reynosa, and Monterrey. Diaz thought that Marlene's advertising agency was located in McAllen. Diaz stated that Publimax did not have any agreements presently with advertising agencies in Texas.

32

Diaz reviewed documents marked as "Exhibit No. 4" for purposes of his deposition.[18] Diaz identified the documents as being "Emails from Myriam Marlene, directed to the people who were in charge of programming, the advertisers and the different stations." Diaz acknowledged that "Marlene identifie[d] herself underneath her name as TV Azteca Texas." However, Diaz did not know what "TV Azteca Texas" is. When asked if Publimax ever allowed Marlene to use "TV Azteca Texas in her dealings with potential advertisers," Diaz replied, "Not that I know of." Diaz explained that Marlene "was in charge of production for Mexican customers. She would bring the customers, or she would include advertising for American customers."

The Trevi Parties' attorney asked Diaz to identify for the record deposition "Exhibit No. 5."[19] Diaz replied, "It's a commercial agreement between Xoana Entertainment and Publimax, in order to be able to broadcast advertising in Reynosa and Matamoros on Channel 7 . . . and 13." Diaz read from the agreement the names of the "advertisers," which were "Andy's Kids Place, Bodies Under Construction, C.N.A.[,] Herbal Nutrition, C.N.A.[,] Herbal Nutrition[,] CrayonMan's Fun House—CrayonMan's Fun House, [and] Excellent Fence." When asked if those advertisers were from Texas, Diaz said, "Possibly, yes." Diaz clarified that he meant that he was "not too sure" whether these advertisers were from Texas. Diaz testified that the "client's address" was not indicated and the only address in the document was Marlene's address. However, when asked if he produced any documents to the Trevi Parties' attorney for advertising contracts that were located in Mexico, Diaz replied, "No." Diaz stated that

[18] These documents are not included in the record.

[19] This exhibit is not included in the record.

he did not "think" that the above listed businesses were still "advertising with Publimax." The Trevi Parties' attorney asked, "You are no longer—Publimax is no longer advertising for Gonzalez Furniture."[20] Diaz said, "I don't think so." The Trevi Parties' attorney then asked if Publimax was still providing advertising for Pueblo Tires, and Diaz responded, "No, I'm not sure."[21]

Diaz acknowledged that Publimax had a bank account in Laredo, Texas from 2003 until 2009. According to Diaz, Publimax had no other bank accounts in Texas or the United States. Diaz acknowledged that Publimax had done business with entities in Texas regarding the purchase of production equipment during the period of 2005 through 2009. Diaz stated that Publimax had been sued in an unrelated case in Hidalgo County, Texas. Diaz testified that the case involved Marlene who "felt that [Publimax] had cut relations with her, had affected her interests." Diaz recalled that the parties had settled out of court.

Diaz stated that Publimax did not have a contract with Echostar, Dish Network, or Direct TV to provide its signal via satellite to Texas. Diaz thought that at some point, Publimax had planned to provide its Mexican programming via satellite to Texas residents. Diaz clarified that "[i]t's a recent [November 2011] agreement" with "Una Vez Mas." According to Diaz, Publimax agreed to "allow" retransmission of its morning newscast "for a certain period of time." The newscasts are televised in Monterrey on "Info 7," and could be viewed in Dallas and Houston, Texas.[22]

---

[20] We note that Gonzalez Furniture was not previously mentioned on the record as being listed in deposition Exhibit No. 5.

[21] We note that no one had previously mentioned that Pueblo Tires was listed on deposition Exhibit No. 5.

[22] Diaz agreed that Publimax and Una Vez Mas had a current agreement.

When asked if Publimax had ever conducted interviews used in programming in Texas and had ever recorded any footage in Texas, Diaz responded, "Possibly" and "Probably" yes. Diaz then stated that he did not know what Publimax employee knew whether Publimax either conducted interviews in Texas or recorded any footage in Texas.

Gomez testified that he is an attorney residing in McAllen, Texas with Trevi and that he is a Mexican citizen.[23] Gomez stated that he has a visa that is "in process" which allows him to reside in the United States. Gomez claimed that he has followed the same process in the past five years to acquire his visa. Gomez had not traveled to the United States since "last year," which was in 2011. Gomez explained that when his visa is "in the process," he must wait for the consulate to call him. Gomez has not travelled to the United States because the consulate has not called him to get his visa. Gomez stated that he did not recall when his last visa expired but believed that it expired on December 7, 2011.[24] Gomez has never "held resident status" in the United States.[25]

Gomez has never practiced law in the United States and had not practiced law in Mexico for the past five years. Gomez stated that he last practiced law in Mexico when he represented Trevi in her criminal case.

When asked if he had viewed any of the alleged defamatory broadcasts, Gomez replied, "Affirmative. In my house in McAllen . . . Texas in January or February . . . . This was in the show Ventaneando where we were defamed, and it was

---

[23] Gomez said that he has resided at his current address in McAllen for seven months.

[24] Gomez gave his deposition on June 20, 2012.

[25] Gomez did not clarify where he considers his residence to be.

in our home in Texas."[26]  Gomez believed that he saw the show in either 2007 or 2008. Gomez stated that he viewed the broadcast on a television that had a "regular antenna" and that the channel's signal was picked up from the air.

When asked if Roberto Olguin, a Mexican lawyer, made allegedly defamatory remarks about him while in Texas, Gomez said that he did not know where Olguin was when he made the remarks.  Gomez agreed that all of the remarks allegedly made by Olguin concerned events occurring in Mexico.

## V.    DISCUSSION

The evidence provided to the trial court in this case undisputedly proves that TV Azteca's program, Ventaneando, where the allegedly defamatory statements were made, was viewed by Texas residents.  In fact, a map from the Azteca Noreste website shows its viewers live in Northern Mexico and South Texas.  The map further shows that in South Texas there were 1,583,829 viewers in 2012.  Diaz testified that Publimax has used the name "TV Azteca Noreste" and that the name belongs to TV Azteca. From this evidence, we conclude that the trial court could have reasonably found that TV Azteca and Publimax have advertised on the internet that they have viewers in South Texas.  Furthermore, the trial court did not err in accepting as true TV Azteca and Publimax's own advertisement concerning its Texas viewers.  Diaz acknowledged that the coverage area for Publimax's television broadcast signal in 2009 was the same coverage area as shown on the map he reviewed during his deposition.  Chapoy testified that Ventaneando is shown five days per week.  And, Trevi and Gomez both

---

[26] Gomez later claimed that he viewed the broadcast "at [his] mom's house on [sic] Sebastian, Mission, Texas."

36

testified that they each saw the program with the allegedly defamatory remarks on their television sets in Texas.

In *Keeton*, the publisher of Hustler Magazine sold "some 10 to 15,000 copies" of its magazine in New Hampshire each month. 465 U.S. at 772. The United States Supreme Court held that Hustler Magazine, Inc.'s "regular circulation of magazines in the forum State was sufficient to support an assertion of jurisdiction in a libel action based on the content of the magazine." *Id.* at 773. Here, the trial court had evidence that programs broadcast by TV Azteca and Publimax is seen in Texas potentially by over one million viewers and that these programs form the basis of the Trevi Parties' defamation suit. We conclude that broadcasting programs to residents of Texas supports an assertion of jurisdiction in this case.[27] *See id.*

Moreover, appellants do not appear to dispute that the program broadcasting the allegedly defamatory statements was shown or viewed in Texas. Appellants, instead, merely claim that the broadcasting by Publimax of TV Azteca's programs to Texas was due to a technical glitch and that they are unable to control or fix this glitch. Thus, appellants argue they have not purposefully directed their activities to Texas despite Publimax's broadcasts of TV Azteca's programming to Texas residents. We disagree

---

[27] We note that other jurisdictions have held that "A defendant expressly aims a defamatory statement at a particular state if he has in some fashion 'entered' the state, for example by broadcasting or distributing the statement there." *Bank Express, Int'l v. Kang*, 265 F.Supp.2d 497, 506 (E.D.Pa. 2003) (citing *Imo Industries, Inc. v. Kiekert AG*, 155 F.3d 265 (3d Cir. 1998); *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club*, 34 F.3d 410, 412 (7th Cir.1994)); *see Massey Energy Co. v. United Mine Workers*, 69 Va. Cir. 118, 121 (2005) (concluding that because "the advertisement was broadcast into Virginia" that "alone [was] a sufficient basis [for asserting] jurisdiction under [Virginia's long-arm] statute); *see also Smith v. Holland, Civ.*, No. 4-2349, 2004 WL 1858041, at * 2 (E.D.Pa. Aug. 18, 2004) ("In defamation cases, the defendant "enters" the forum state by broadcasting or publishing the defamatory statement there.").

with appellants because the evidence supports a conclusion that appellants purposefully directed their activities at Texas as explained further below.

Calderon testified that TV Azteca has attempted to enter the broadcast industry in Texas and owns a subsidiary knows as Azteca America. Both TV Azteca and Azteca America use the same logo, and TV Azteca owns the trademark for the logo in Mexico. Evidence was presented that Azteca America has a show entitled Ventaneando America and that Chapoy hosted that program for Azteca America when it celebrated the fifteenth anniversary of Ventaneando.

A press release from Azteca America regarding Chapoy's appearance states that Azteca America targets Spanish speaking families in the United States, operates in sixty-six markets nationwide, and can be seen on "DIRECTTV" and "DISH Network." The press release sets out that "Azteca America has access to the best programming from Azteca's three national networks, including a library with over 200,000 hours of original programming and news from local bureaus in 32 Mexican states." The press release further states that Ventaneando America had been broadcast on Azteca America for nearly seven years and had been broadcast in Mexico for fifteen years. In fact, Chapoy, who claimed to only host the Ventaneando shown in Mexico, remarked in the press release, "We work very hard to find the sort of information that isn't readily made available in a press conference or in interviews. We investigate what is happening everywhere from every angle and that is an enormous challenge." Chapoy makes no distinction between Ventaneando America and Ventaneando. In the press release, Alberto Santini Lara, the vice president of production, programming and marketing for Azteca America and the general director of Azteca 13, is quoted as stating

that Ventaneando is "one of the most successful and influential programs" in the United States and Mexico.

Calderon testified that TV Azteca gave AIC, an American corporation, a content license allowing AIC to broadcast Ventaneando in the United States. Calderon stated that AIC uses its content license given to it by TV Azteca to market itself in the United States. From this evidence, and the evidence that TV Azteca and Publimax advertised South Texas as one of its viewership markets, the trial court could have reasonably found that TV Azteca and Publimax intended for Texas viewers to watch its programs, including Ventaneando.[28]

In its 2005 Annual Report, TV Azteca stated:

> The programs produced in-house by TV Azteca have a higher average cost than purchased programs. TV Azteca seeks to offset its production costs by selling its in-house programs outside of Mexico. In 2003, 2004, and 2005, TV Azteca sold approximately 27,111; 23,905; and 24, 513 hours (including 6,467 hours per year, estimated to have been sold to EchoStar), respectively, of in-house produced programming, resulting in sales of 161 million Pesos, 131 million Pesos (US $13 million)(nominal), and 101 million Pesos (US [$]9.1 million)(nominal), respectively.

---

[28] The burden is on appellants to provide evidence that AIC and Azteca America did not show the same Ventaneando program containing the alleged defamation in Texas. *See Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007); *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 793 (Tex. 2002); *El Puerto de Liverpool, S.A. de C.V. v. Servi Mundo Llantero, S.A. de C.V.*, 82 S.W.3d 622, 628 (Tex. App.—Corpus Christi 2002, pet. dism'd w.o.j.). There is sufficient evidence in the record to support a finding that the programs viewed by the Trevi Parties in Texas were shown pursuant to TV Azteca's agreement with AIC and Azteca America. Thus, we conclude that this is another basis that supports the trial court's denial of their special appearance. We further note, that when given the opportunity, appellants' deposition witnesses would not or could not explain the relationship between TV Azteca, AIC, Publimax, TV Azteca Noreste, and Azteca America sufficiently to support a finding that these entities did not all provide either advertising or programming to Texas residents concerning the Ventaneando program. Moreover, Chapoy claimed that she is well-known in the United States. The trial court may have also questioned how Chapoy, who claimed to have only aimed her programs to Mexican residents, could be well-known in a country that she claims she has purposefully avoided directing her programs to.

Also, in March, 2000, TV Azteca executed a "programming contract with EchoStar" to deliver a satellite feed of Azteca 13 programming to EchoStar. TV Azteca made more than two million dollars from the deal in 2003, 2004, and 2005.

Taken together, we conclude that the above-mentioned evidence supports a finding that Ventaneando is targeted to Spanish speaking viewers in the United States. This evidence, when combined with the undisputed evidence that TV Azteca can been viewed by South Texas residents, establishes that TV Azteca and Publimax have purposefully directed their programs, including Ventaneando, to Texas.

TV Azteca and Publimax's regular broadcasts of its programs to potentially thousands of Texas viewers cannot be characterized as random, isolated, or fortuitous. *See Keeton*, 465 U.S. at 774. Appellants claim that this so-called "spillover" into Texas is merely fortuitous. However, as explained, the evidence presented belies their argument. Therefore, we conclude that Publimax's and TV Azteca's purposeful broadcasts of its programs in Texas satisfy the minimum contacts required by the due process clause.

In *Keeton,* the United States Supreme Court stated that Hustler Magazine, Inc. "chose to enter the New Hampshire market"; thus, Hustler Magazine, Inc. could have been "charged with knowledge of [New Hampshire's] laws and would have claimed the benefit of them if it had a complaint against a subscriber, distributer, or other commercial partner." *Id.* at 779. Here, there is evidence that TV Azteca and Publimax chose to enter the Texas market by broadcasting to Texas and according to Diaz, Publimax has advertisers from Texas who pay for commercial air time and that Publimax has aired commercials from entities or businesses located in Texas from

40

1994, when it entered its agreement with TV Azteca, until the present. Diaz also testified that TV Azteca received some percentage of the advertising revenues that Publimax receives pursuant to their contract. Moreover, in its 2007 annual report, TV Azteca documented that it had entered a contract with Alta Empresa in December 2001 wherein Alta Empresa agreed to commercialize and sell TV Azteca throughout the world and initially, Alta Empresa was only allowed to sell TV Azteca's programming in the United States. TV Azteca would receive "99% of the net profits resulting from the commercialization and sale of its programming outside of Mexico." Also, the report states that because TV Azteca's in-house produced programs have a higher average cost of production than purchased programs, TV Azteca intended to "offset its production costs by selling its in-house produced programs outside of Mexico." Taking the evidence together, the trial court could have found that TV Azteca intended to profit through its broadcasts directed to Texas. Thus, we conclude that TV Azteca and Publimax can be charged with knowledge of the laws of Texas, and we have no doubt that they would have claimed the benefit of them if they had had a complaint regarding its programs or the advertisers in the Texas market.

Appellants argue that under *Calder*, the defamatory *statements* must have had some connection with Texas. *See Calder*, 465 U.S. at 788–89. However, in *Keeton*, the plaintiff was not from New Hampshire, and the Supreme Court did not find the actual statements made about the plaintiff in the magazine, which arguably had no connection to New Hampshire, relevant to its jurisdictional analysis. *See Keeton*, 465 U.S. at 772 (stating that the plaintiff was a New York resident and that her only connection with New Hampshire was "the circulation there of copies of a magazine that she assist[ed] in

41

producing"). In fact, the sole reason the plaintiff in *Keeton* sued in New Hampshire was due to New Hampshire's six-year statute of limitations.[29] *Id.* at 773. The *Keeton* Court stressed that in some cases it might be relevant to consider the plaintiff's residence in the forum because the "Plaintiff's residence may be the focus of the activities of the defendant out of which the suit arises." *Id.* at 780. However, in *Keeton*, the Court did not find the plaintiff's residence to be relevant to its inquiry. *Id.* at 779 ("[W]e have not to date required a plaintiff to have 'minimum contacts' with the forum State before permitting that State to assert personal jurisdiction over a nonresident defendant. On the contrary, we have upheld the assertion of jurisdiction where such contacts were entirely lacking.").[30] We find no support in *Keeton* that leads to a conclusion that when defamatory statements are purposefully directed at a forum, we must consider what was said in our minimum contacts determination. We also note that in *Keeton*, the "bulk" of the plaintiff's "alleged injuries had been sustained outside New Hampshire." *Id.* at 773.

Moreover, the United States Supreme Court in *Calder* merely considered the contents of the alleged defamation in order to link the defendants to the forum. *Calder*, 465 U.S. at 790 (explaining that the defendants' "intentional, and allegedly tortious, actions were expressly aimed at California" and the defendants' each knew that the article "would have a potentially devastating impact upon respondent [the plaintiff]" in California). The *Calder* Court did not establish per se that the defamatory statements if made in or directed at the forum must concern activities of the defamed person in that

---

[29] New Hampshire was the only state where the plaintiff's suit would not have been time-barred when she filed it. *Calder*, 465 U.S. at 773.

[30] In *Keeton*, the Supreme Court emphasized that the "tort of libel is generally held to occur wherever the offending material is circulated" and that the "communication of the libel may create a negative reputation among residents of a jurisdiction where the plaintiff's previous reputation was, however, small, at least unblemished." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 777 (1983).

state.[31]  *See generally id.*  The Court could not find that the defendants had made the alleged defamatory statements in California, the forum state, because South, one of the defendants, undisputedly wrote the complained-of article in Florida and Calder, as the editor, "reviewed and approved the initial evaluation of the subject of the article and edited it in its final form" in Florida.[32]  *Id.* at 786.

We agree with appellants that the focal point of our analysis should not be on where the plaintiffs felt the harm caused by the defamation if the defendants have not directed the publication or broadcast at the forum.  However, we have concluded that appellants in this case purposefully directed their programs wherein the allegedly defamatory statements occurred to Texas residents.  Thus, we have not considered the Trevi Parties' injury or residence in our analysis because it is not relevant.[33]

We also conclude that our decision in this case is consistent with *Clemens v. McNamee*, 615 F.3d 374, 380 (5th Cir. 2010) because we have concluded that appellants' allegedly defamatory actions were purposefully directed to Texas.  In *Clemens*, the Fifth Circuit Court of Appeals, applying *Calder*, stated that the emphasis in a libel cause of action when the defamatory statements are not made in or directed at

---

[31] The issue in *Calder* was whether jurisdiction was proper in California even though the defendants, a reporter and an editor, wrote and edited the article in Florida.  *Calder v. Jones*, 465 U.S. 783 (1984).  The decision did not address jurisdiction over the publishers of the magazine wherein the alleged defamation occurred.  However, *Keeton*, did address the publisher of a magazine that had allegedly contained defamatory statements and that was sold to residents of New Hampshire.  *Keeton*, 465 U.S. at 772.

[32] South's contacts with California consisted of frequent business trips to California, and phone calls to sources in California.  Calder had been to California only once or twice on a pleasure trip.  *Calder*, 465 U.S. at 786.

[33] As previously explained, the *Keeton* Court recognized that the plaintiff's residence may be relevant to a minimum contacts analysis because the relationship between the defendant and the plaintiff's residence may "enhance" the defendant's contacts with the forum state, especially if the plaintiff's residence is the focus of the defendant's activities related to the suit.  *Keeton*, 465 U.S. at 780.

43

Texas is on whether Texas was the focal point of the story. *Id.* Again, in *Clemens*, the issue did not concern the publishers of a magazine or the broadcasters of a television program or channel purposefully directing its broadcasts to Texas. Instead, the defendant was an individual who made statements about Roger Clemens in New York and Canada. *Id.* at 377. Thus, the court applying *Calder* held that the defendant's statements were not "aimed at or directed to Texas, and were not made in Texas." *Id.* In this case, appellants produced and broadcast a program containing the allegedly defamatory statements about the Trevi Parties that was shown in Texas and directed the broadcast to Texas residents.

Once the Trevi Parties pleaded sufficient allegations bringing Chapoy within the provisions of the Texas long-arm statute, the burden shifted to her. *See BMC Software*, 83 S.W.3d at 793. Here, appellants have not contended on appeal that the Trevi Parties failed to plead sufficient allegations to bring them under the Texas long-arm statute. Therefore, the burden was on Chapoy to negate all bases of personal jurisdiction alleged by the Trevi Parties. *See Moki Mac River Expeditions*, 221 S.W.3d at 574; *BMC Software*, 83 S.W.3d at 793; *El Puerto de Liverpool, S.A. de C.V.*, 82 S.W.3d at 628. Thus, Chapoy had the burden of establishing that jurisdiction is inappropriate under the minimum contact analysis.

The Trevi Parties' alleged in their live pleading that Chapoy purposefully directed her allegedly tortious activities to residents of the State of Texas and that the causes of action asserted by them arose from and/or were connected with Chapoy's purposeful acts. As stated above, the evidence shows that TV Azteca and Publimax purposefully directed broadcasts of their programs to Texas—Ventaneando wherein the allegedly

44

defamatory statements were made. The Trevi Parties alleged that Chapoy produced a television program where she made and reported defamatory statements that were directed at residents of Texas.

When given the opportunity at her deposition to provide evidence negating the Trevi Parties' allegations, Chapoy claimed ignorance. Chapoy claimed that although a press release indicated that she had hosted a program celebrating the fifteenth anniversary of Ventaneando and the seventh anniversary of Ventaneando America, she did not know when she hosted Ventaneando America and she did not know that she was participating in a television program that is aired in the United States on Azteca America. And, when confronted with the press release explaining that she had hosted the show to celebrate her show's anniversary, she claimed that she just does what she is told to do and that she does not remember the specifics of the "promotions" she does. Chapoy also claimed that she was not aware of whether Ventaneando America is the same program as Ventaneando. Moreover, as stated above, the evidence shows that the two programs are similar if not the same.

We disagree with appellants' argument that under *Calder* and *Clemens*, Texas courts do not have jurisdiction over Chapoy. The *Clemens* court reasoned that the non-resident defendant's statements were not adequately directed at Texas and were not made in Texas. The court explained that it found the reasoning in *Revell v. Lidov*, 317 F.3d 467, 469 (5th Cir. 2002) instructive and quoted *Revell's* holding that the defendant's statements were "not directed at Texas readers as distinguished from readers in other states. [And that] Texas was not the focal point of the article or the harm suffered." *Clemens*, 615 F.3d at 379. The *Clemens* court stated that the question

45

before it was whether the defendant who allegedly defamed Clemens "aimed or directed" his statements to Texas. *Id.* The court found that the defendant did not make the statements in Texas and the defendant did not direct his statements to Texas residents.[34] *Id.*

However, in this case, the program and statements were directed to Texas residents as explained above. Trevi testified that she had been approached in Texas by reporters from TV Azteca and had seen on TV Azteca that reporters were at her mother's home in McAllen. Trevi had avoided these reporters. From this evidence the trial court could have found that research had been conducted in Texas to produce the complained-of television show. Chapoy stated in her affidavit that the complained-of reports were investigated, written, and prepared in Mexico, and Chapoy denied using sources in Texas in order to acquire information for her show. The Trevi Parties provided to the trial court an email from Chapoy requesting to interview Trevi, and as stated above, there was some evidence that reporters had followed Trevi and been at her mother's home. From this evidence, the trial court could have inferred that Chapoy contacted Trevi while she was in Texas to conduct research and that other reporters had been in Texas doing research for Chapoy's program. Even though Chapoy denied that she did any research for the program at issue in Texas or that she used any sources in Texas, we must presume that the trial court resolved all factual disputes in favor of its ruling. *See Glattly*, 177 S.W.3d at 445. As to the final *Calder* element, Trevi testified that she and her children felt the harm of the alleged defamation in Texas. *Calder*, 465 U.S. at 790.

---

[34] The defendant in *Clemens* made his complained-of statements in New York and Canada and not in Texas. *Clemens*, 615 F.3d at 380.

Based on the evidence presented, the trial court could have reasonably found that Chapoy knew that her program would be viewed on TV Azteca by Texas residents. We conclude that the evidence supports a finding that Chapoy directed the statements she made on Ventaneando to residents of Texas. Therefore, Chapoy has not met her burden to overcome the strong presumption that Texas courts have jurisdiction over her in this case. *See Moki Mac River Expeditions*, 221 S.W.3d at 574; *BMC Software*, 83 S.W.3d at 793; *El Puerto de Liverpool, S.A. de C.V.*, 82 S.W.3d at 628.

We also conclude that jurisdiction over appellants in Texas would not offend traditional notions of fair play and substantial justice because "[t]here is not unfairness in calling [them] to answer for the contents of" their programming and broadcasts wherever a substantial number of viewers are able to access it. *Keeton*, 465 U.S. at 781. Finally, the Texas long-arm statute allows jurisdiction over non-resident defendants who commit a tort in Texas. TEX. CIV. PRAC. & REM. CODE ANN. § 17.042. Here, the Trevi Parties have alleged that appellants committed several torts in Texas when they broadcast the allegedly defamatory statements. Because the Texas long-arm statute reaches as far as the Constitution allows, and we have concluded that appellant purposefully directed their broadcasts at Texas, we conclude that, as set out in *Keeton*, all the requisites for personal jurisdiction in Texas are present. *See id.* at 774–75. We overrule appellants' first and second issues contending that the trial court reversibly erred by denying their special appearances and finding that it had specific jurisdiction over appellants.[35] We likewise overrule appellants' fourth issue that the trial

---

[35] Because we have determined that the requirements of specific jurisdiction have been met in this case, we need not address appellants' third issue regarding whether the general jurisdictional requirements have been met. *See* TEX. R. APP. P. 47.1.

47

court reversibly erred by finding that exercising personal jurisdiction over appellants would not offend traditional notions of fair play and substantial justice. *See id.* at 781 ("[T]here is no unfairness in calling [a defendant] to answer for the contents of [its] publication wherever a substantial number of copies are regularly sold and distributed.").

## VI. OBJECTIONS

By their fifth issue, appellants complain about the trial court's overruling their objections to evidence presented by the Trevi Parties in response to appellants' special appearance. We did not consider much of the complained-of evidence for purposes of our analysis. Thus, we will only address the relevant objections to the evidence we have considered in our analysis.

Appellants' challenge the trial court's consideration of Sunday's deposition testimony regarding Publimax's and TV Azteca's sale of advertising space to Texas businesses. However, Diaz also testified that Publimax has advertisers from Texas who pay for commercial air time and that Publimax has sold advertising space to Texas businesses since 1994 when it entered into the contract with TV Azteca. Therefore, we need not consider Sunday's testimony for purposes of this appeal. Accordingly, we need not address appellants' contention that the trial court improperly considered Sunday's deposition testimony as it is not dispositive. *See* TEX. R. APP. P. 47.1.[36]

---

[36] Patti Sunday testified by deposition that she is an "ad agent" and that Publimax and TV Azteca offered to sell her ad space for her Texas clients from 2005 to 2009. Sunday stated that people claiming to be representatives of Publimax came to her McAllen office asking her to buy ad space for her clients. Although she was still researching whether she actually bought ad space, Sunday recalled that she had and that "it was something to do with soccer." Sunday stated that she was aware that Publimax was "in the marketplace" to "obtain advertising revenue" from Texas businesses and that "people were buying" ads from Publimax. Sunday did not have personal knowledge regarding the amount of revenue Publimax received from selling ads to Texas businesses. Sunday stated, "But at the time, they were coming in and saying, if they were honest, you know, 'We're here,' and 'So and so is buying from us,' and 'So and so is

48

Appellants also challenge the trial court's consideration of Diaz Deposition Exhibit No 3. Appellants, citing *PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 169–70 (Tex. 2007), argue that the trial court should have granted their objection to Diaz Deposition Exhibit No. 3 on the basis that the map was dated 2012, which occurred after the lawsuit had been filed. In *PHC-Mindon*, the Texas Supreme Court analyzed whether Texas had general jurisdiction over the non-resident defendant. *Id.* at 171. In its analysis, the court stated that general jurisdiction has a "more demanding minimum contacts analysis" and described general jurisdiction as a "dispute-blind" analysis in contrast to specific jurisdiction which focuses on whether the dispute is "arising out of or related to the defendant's contacts with the forum." *Id.* at 168. The court then determined that when a court reviews evidence regarding general jurisdiction, "the relevant period ends at the time suit is filed." *Id.* at 169. Thus, based solely on this case, appellants argue the trial court could only review the evidence that related to events occurring before the Trevi Parties filed suit in this case.

However, as stated above, the *PHC-Mindon* court based its holding on whether Texas had general jurisdiction over the non-resident defendant. The court did not address cases where specific jurisdiction is at issue. In fact, the *PHC-Mindon* court stated its reasoning as follows: "[G]eneral jurisdiction is dispute-blind; accordingly, and

buying from us.'"

Sunday explained that Miriam Morales represented Publimax and TV Azteca during the time that they were offering to sell her ad space. Sunday testified that she referred to the people, such as Morales, as employees of Publimax and TV Azteca because in her industry that is how she refers to "the person [that she] does business with to place an order to get [her] customers on the air." However, Sunday had no personal knowledge of how such people were paid or if they were considered employees under Mexican law.

According to Sunday, TV Azteca had a business office and a small production studio in McAllen. Sunday stated that she visited the studio and that it was located on "a little side industrial street off of Jackson Road." Sunday did not know whether this "studio/business" office still existed.

in contrast to specific jurisdiction, the incident made the basis of the suit should not be the focus in assessing continuous and systematic contacts—contacts on which jurisdiction over any claim may be based." *Id.* at 170. The court made no finding regarding specific jurisdiction. *See generally id.*

Here, the trial court found that Texas has specific jurisdiction over appellants, and we have affirmed the denial of appellants' special appearance on that basis. Appellants have not cited any authority supporting a basis for the trial court to have sustained their objection to Diaz Deposition Exhibit No. 3 for purposes of analyzing whether Texas has specific jurisdiction over them. *See* TEX. R. APP. P. 38.1(i). Therefore, we conclude that the trial court did not abuse its discretion in overruling appellants' objection.[37] As to all of the other objections to different portions of the record, as previously stated, we have not considered the objected-to evidence for purposes of our analysis. Thus, to the extent the trial court committed error, it was harmless. We overrule appellants' fifth issue.

## VII. CONCLUSION

We affirm.

ROGELIO VALDEZ
Chief Justice

Delivered and filed the
30th day of January, 2014.

---

[37] Whether the trial court improperly considered the exhibit for its general jurisdiction analysis is not relevant to our determination that the trial court properly found specific jurisdiction. Thus, we need not address that claim. *See* TEX. R. APP. P. 47.1.

50